**Glenn R. HENDERSON, Plaintiff,**

v.

**Jo Anne BARNHART,[1] Commissioner of the Social Security Administration, Defendant.**

**No. 00–C–1537.**

United States District Court, E.D. Wisconsin.

May 31, 2002.

---

1. Pursuant to Fed.R.Civ.P. 25(d)(1) and 42 U.S.C. § 405(g), last sentence, I have amended the caption to reflect Jo Anne Barnhart's appointment as Commissioner of the Social Security Administration.

Lynn M. Zuehlsdorf–Mack, Mack Law Office, Milwaukee, WI, for Plaintiff.

Penelope C. Fleming, United States Department of Justice, Office of the U.S. Attorney, Milwaukee, WI, for Defendant.

## DECISION AND ORDER

ADELMAN, District Judge.

Plaintiff Glenn R. Henderson ("plaintiff") brings this action under 42 U.S.C. § 405(g) for judicial review of the decision of defendant Jo Anne Barnhart, Commissioner of Social Security ("defendant" or "the Commissioner"), denying his application for disability insurance benefits and supplemental security income under the Social Security Act. The action was assigned for pretrial purposes to Magistrate Judge Patricia A. Gorence who recommended that the decision be affirmed. See 28 U.S.C. § 636(b)(1). Plaintiff filed timely objections, and the matter is before me for decision.

## I. BACKGROUND

### A. Procedural History

Plaintiff filed an application for disability benefits on September 10, 1998 [2] claiming that he had been disabled since May 1, 1998 due to hypertension, liver disease, and back pain. Plaintiff wrote in his accompanying disability report that he had an automobile accident in November 1996 [3] at which time the doctor discovered other problems (e.g. hepatitis). Plaintiff continued to work thereafter, but went on light duty and subsequently took a leave of absence, before quitting on May 1, 1998. He stated that he experienced constant headaches, weakness, dizziness, blood in his

---

2. The record indicates that plaintiff may have also applied for benefits in 1992 but does not include specifics on that claim.

3. The medical records reveal that the accident occurred on January 9, 1997.

stool, stress, tension, and pain, and as result could not work.

Plaintiff also completed a daily activities questionnaire in which he indicated that he lived alone in an apartment, had no current income and was unable to engage in his former employment as a production worker. He stated that he was five feet, nine inches tall and weighed 289 pounds. He described a typical day as making the bed, washing dishes, eating, taking a nap, watching television, talking on the phone, eating, then going to bed. He indicated that if he was home he prepared his own meals, but that he also visited his mother and grandmother, and that they cooked for him. He reported sleeping ten to fifteen hours per day.

Plaintiff also completed a vocational report in which he described his past employment. He indicated that he worked as a machinist from 1990 to 1998, as a security guard from 1984 to 1991 and as a liquor store manager from 1981 to 1984. He wrote that his last job as a machinist required him to walk or stand six hours per day and lift up to 100 pounds, twenty-five pounds frequently. He wrote that the security guard position required him to be on his feet about five hours per day and called for lifting up to 10 pounds. Finally, he indicated that as a store manager he was required to be on his feet six hours per day and lift up to fifty pounds frequently.

On October 19, 1998, plaintiff's physician, Dr. Keith Crawley, signed a form report stating that plaintiff was "seriously impaired and unable to work or return to normal functioning for at least 12 months." (Tr. at 95.) He listed plaintiff's diagnoses as chest pain, high blood pressure—severe, vertigo, hepatitis C and angina.[4]

The application was denied initially on or about January 11, 1999. On February 19, 1999 plaintiff requested reconsideration, stating that "mentally my condition has gotten worse." (Tr. at 102.) Plaintiff's friend Livette Robertson completed an activities questionnaire about him and stated that his grooming and personal hygiene were questionable, he was moody, liked to be alone, and that she found him "somewhat frightening." (Tr. at 110.) On May 26, 1999 the denial of benefits was affirmed.

On June 16, 1999 plaintiff requested a hearing. In his accompanying statement he indicated that he was taking medication for his liver, which caused severe side effects. On October 12, 1999 Administrative Law Judge ("ALJ") Robert L. Bartelt, Jr. held a hearing at which plaintiff was the only witness. On June 12, 2000, the ALJ issued a decision finding that plaintiff was not disabled and therefore not entitled to benefits. The Appeals Council denied plaintiff's request for review. On December 5, 2000 plaintiff filed this action pro se, but he has since retained counsel.

### B. Testimony at Hearing

At the hearing plaintiff appeared without counsel. The ALJ did not discuss with plaintiff his right to representation. Plaintiff signed a form waiving his right to counsel, but the form did not contain an explanation of how an attorney might benefit him, that contingency fees were limited to twenty-five percent of any recovery or that attorneys' fees had to be approved by the court.

At the hearing plaintiff testified that he was forty years old, five feet nine inches tall and weighed 250 – 270 pounds. He stated that his regular adult weight was

---

**4.** Part of the form may have been completed by a physician's assistant, but it was signed by Dr. Crawley.

190 pounds. He indicated that he had completed the eleventh grade and obtained a GED but had received no other training or schooling.

Plaintiff testified that he last worked as a PMC machine operator for Tetro Ware in May 1998. He stated that the machine was run by a computer and produced paper cups. His job was to maintain the machine, feed paper into it, keep it lubricated and inspect the product. He performed the job standing up, in twelve hour shifts, and was required to lift from ten to sixty pounds.

Plaintiff stated that before working for Tetro Ware he was a punch press and machine operator, security guard and liquor store clerk. Plaintiff indicated that he also performed census work for the state, which required counting cars on the freeway and city streets and going door to door obtaining information about people's travel habits.

The ALJ then questioned plaintiff about his health problems. Plaintiff stated that while working at Tetro Ware he noticed that he became fatigued and short tempered. He stated that he was involved in an automobile accident and, while being treated for his injuries, was found to have hepatitis. He was told that his liver condition would worsen, and that it was sapping his strength.

Plaintiff stated that he was eventually forced to quit his job. He became depressed because of the loss of strength and energy and had to see a psychiatrist. He also testified that shortly before he quit he suffered a work-related back injury.[5] He stated that the combination of the depression and the injury rendered him unable to stand, squat, kneel and bend for a twelve hour shift.

Plaintiff stated that for a time his employer reluctantly permitted him to work eight hour shifts. Eventually, a company doctor said that he could work twelve hour shifts. He testified that he then returned to twelve hour shifts, but by May 1998 it became too much, and he had to quit. He also testified that the anti-depressants and pain medications he was taking interfered with his alertness on the job.

Plaintiff testified that he was not immediately able to begin treating his liver condition because of high blood pressure. Eventually, his blood pressure was brought under control, and he began taking interferon and rebetol about four months before the hearing. However, he found that the medication sapped his energy, strength, and sex drive, made him want to be alone and affected his sense of taste.

Plaintiff indicated that he had begun counseling but stopped because of transportation problems. He said that he discontinued anti-depressants about a month and a half before the hearing because they caused gout. He testified that he took Trazodone to help him sleep, and that his psychiatrist, Dr. Kisicki, prescribed Paxil and Valproic. He stated that he also took an anti-inflammatory medication called Indomethacin (apparently for gout).

Plaintiff testified that Dr. James Robinson, a gastroenterologist, treated his liver disease, and that he saw the doctor every three months. He stated that he might have to take medication for hepatitis for three to eighteen months.

Plaintiff stated that since he no longer worked he did not "do anything." (Tr. at 48.) He stayed at home unless a family member took him out. He occasionally made a sandwich but spent most of him time with his mother and grandmother. He stated that he did not do any cleaning

---

**5.** The medical records indicate that this injury occurred on October 17, 1997.

or laundry, and that his grandmother did it for him.

When asked whether he could perform his past work, plaintiff said that his "concentration is not there anymore." (Tr. at 49.) He also stated that due to his back injury he was physically unable to do his past work. He testified that the most he could lift on a regular basis was five·or ten pounds, and that he never had had a job that light. He stated that he could walk a couple of blocks and stand for fifteen minutes but was unable to sit for long periods. He testified that he· slept ten or fifteen hours per day but had difficulty sleeping at night. He stated that he had more energy when he took the medication prescribed by the psychiatrist, but that he was concerned about taking too many pills.

## C. Medical Evidence

The medical records revealed that plaintiff was involved in a motor vehicle accident on January 9, 1997, and was treated at St. Mary's Hospital—Racine complaining of neck, head, and shoulder pain. An x-ray of the cervical spine revealed mild degenerative disc disease. Plaintiff was discharged with instructions to apply heat to the affected area and not to work the next day. He was given a prescription for pain medication.

However, due to abnormal liver studies following the accident, plaintiff was referred to Drs. Walters and Geenen at Gastroenterology Consultants Ltd. Their initial note of March 4, 1997 indicated that plaintiff suffered from hypertension and complained of fatigue. Lab tests revealed that plaintiff tested positive for hepatitis B core antibody and surface antibody, and hepatitis C antibody. Additional tests were performed at St. Mary's—Racine, and on April 8, 1997 plaintiff returned to see Drs. Walters and Geenen. He continued to complain of fatigue but had no significant additional complaints. The doc-

tors scheduled an ultrasound and a liver biopsy. The ultrasound revealed no focal hepatic abnormality, and the biopsy revealed chronic hepatitis, grade 1, stage 0, with no evidence of hemosiderin.

On May 6, 1997 plaintiff complained to his doctors of increased fatigue and depression. He also said that he had observed blood in his stool. The doctors planned to enroll plaintiff in an Interferon/Ribavirin protocol in July. The doctors also scheduled a sigmoidoscopy related to plaintiff's complaints of rectal bleeding, and the procedure revealed internal hemorrhoids. The doctors prescribed Metamucil and advised plaintiff to undergo therapy for his hepatitis.

On August 26, 1997, plaintiff was referred for enrollment in the Interferon/Ribavirin study at St. Luke's Hospital. However, concerns about his hypertension caused this treatment to be deferred until several months before the hearing.

The ALJ also received records from All Saints Medical Group concerning plaintiff's back problems and hypertension. On October 29, 1997 plaintiff was seen for a work-related back injury that had occurred on October 17. He complained of right low back pain radiating to the right buttock. Plaintiff was diagnosed with lumbar sprain and strain, prescribed pain medication and physical therapy, and restricted to eight hour work days performing only light duty. An x-ray of the lumbar spine revealed possible L5–S1 degenerative disc disease without acute bony abnormality.

On November 3, 1997, plaintiff reported increased low back pain. He was diagnosed with lumbar sprain and disc and/or facet pain, taken off·of work and scheduled for physical therapy. On November 14 plaintiff was permitted to return to work on eight hour shifts after substantial improvement.

· On December 1, 1997, plaintiff was seen again, still complaining of back pain. A CT scan was performed on December 30, 1997 and revealed mild disc bulging at L4–5 and moderate bulging at L5–S1. Plaintiff had another appointment on January 7, 1998 and continued to complain of back pain. The doctor noted plaintiff's disc bulging but indicated that the primary cause of plaintiff's symptoms was a right sacroiliac joint strain. Plaintiff was referred to work hardening and continued on an eight hour per day restriction.

On February 4, 1998, plaintiff was examined by Dr. Clark for hypertension. Dr. Clark prescribed medication and recommended a low fat diet and regular exercise. On February 25, 1998 plaintiff saw Dr. Clark again. He had not yet started on medication because he had lost the prescription. He complained of depression, tightness of the chest and shortness of breath. He was referred for a renal ultrasound, an EKG, and a stress test and advised to begin taking his medication immediately and remain off work.

Plaintiff saw Dr. Clark again on March 4. He had missed his stress test and two follow-up appointments for his blood pressure. However, he had begun taking his medication. Plaintiff explained that it was difficult for him to keep appointments because he lived in Milwaukee, and his doctor was located in Racine. Plaintiff complained of tightness of the chest and intermittent shortness of breath, nonspecific left arm pain and occasional headaches. Due to his chest pain and malignant hypertension the doctor suggested that plaintiff be hospitalized. Plaintiff rejected the doctor's suggestion but agreed to an increase in his medication and close monitoring. On March 10, 1998 plaintiff underwent a stress test that was relatively normal.

The records of St. Luke's Medical Center in Milwaukee regarding the results of a November 19, 1998 cardiac stress test were also received. The impression was that the test was "clinically negative and electrocardiographically probably negative for ischemia." (Tr. at 169.)

Dr. Robinson's records were also received. On December 1, 1998, Dr. Robinson performed a colonoscopy, which revealed that plaintiff's rectal bleeding was caused by hemorrhoids. An April 8, 1999 note from Dr. Robinson indicated that plaintiff was soon to start interferon/ribavirin treatment for his hepatitis.

Records of the Milwaukee County Mental Health Division were also received. Dr. Crawley referred plaintiff there in December of 1998 for depression. The diagnosis was adjustment disorder—depressed mood, and plaintiff was prescribed Wellbutrin and Trazodone. He returned on December 14 and reported feeling better.

However, plaintiff was again treated at the Mental Health Division in February and March of 1999. He complained of inability to sleep, irritability and depression and was prescribed Paxil and Trazodone. The medication apparently improved his sleep but not his mood.

Medical records from MLK–Heritage Health Center were also received. The initial note from September 17, 1998 indicated that plaintiff presented for a refill of his hypertension medication. On September 18 he presented with complaints of shortness of breath, headaches, and chest pain, and apparently was given medication.

Plaintiff returned on October 1 complaining of headaches, dizziness, fatigue, numbness in his feet, blood in his stool, shortness of breath when walking and left side chest and arm pain. His medication was increased. However, when he returned on October 8, his blood pressure was still uncontrolled despite the medications.

On October 26, 1998, a treadmill stress test was conducted. Dr. Soin noted borderline abnormal resting EKG, slightly elevated blood pressure and no EKG evidence of ischemia or arrhythmia. Plaintiff returned to the doctor's office on November 5, 1998, complaining of persistent chest pain and tightness. On November 19 he was again seen and noted to have high blood pressure and acute situational anxiety. Plaintiff continued to be seen in February and March 1999, and he complained of chest pain and depression.

Finally, records from Froedert Hospital dated October 30, 1998 to April 16, 1999 concerning plaintiff's cardiac treatment were received. They revealed that plaintiff complained of angina, dizziness, headaches, and difficulty sleeping. He was prescribed various medications.

The record also contains several evaluative reports. On December 12, 1998, Dr. A. Neil Johnson evaluated plaintiff for the Wisconsin Disability Determination Service. Dr. Johnson's conclusions were poorly controlled hypertension with no evidence of heart failure or stroke, chest pain that may or may not be angina pectoris, low back pain and hepatitis C.

On January 6, 1999, Dr. Chan completed a Residual Functional Capacity Assessment. He estimated plaintiff's exertional limitations as lifting up to fifty pounds occasionally, twenty-five pounds frequently, standing or walking for a total of six hours per day, sitting for six hours per day and no limitations on pushing or pulling. Dr. Chan stated that plaintiff had full range of motion and no loss of strength, no muscle spasm, and no evidence of heart failure or stroke. He found no postural, manipulative, visual, communicative or environmental limitations. His report indicated that no treating source statement was in the file. It is unclear why he did not receive Dr. Crawley's report of October 19, 1998.

Finally, a May 20, 1999 Mental Residual Functional Capacity Assessment indicated that plaintiff was capable of doing simple, routine work. A Psychiatric Review Technique form of the same date indicated that plaintiff did not have a disabling mental condition identified in the listings.

## II. APPLICABLE LEGAL STANDARDS

### A. Standard of Review of Magistrate's Recommendation

■ Where a party timely objects to a magistrate's recommendation, I conduct a de novo review of the objected to portions, 28 U.S.C. § 636(b)(1); *see United States v. Raddatz,* 447 U.S. 667, 673–76, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980); and may review de novo any other aspects as I see fit. *See Delgado v. Bowen,* 782 F.2d 79, 81–82 (7th Cir.1986). Because plaintiff has objected, I will conduct a de novo review.

### B. Manner of Proving Disability

Under the Social Security Act, a person is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security regulations prescribe a sequential five-step test for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920. Under this test the ALJ must determine: (1) whether the claimant is presently unemployed; (2) if so, whether the claimant has a severe impairment or combination of impairments; (3) whether any of the claimant's impairments are listed by the Social Security Administration as being so severe as to preclude substantial gainful activity; (4) if not, whether the claimant possesses the residual functional

capacity ("RFC") to perform his past work; and (5) if not, whether the claimant is able to perform any other work in the national economy in light of his age, education and work experience. *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir.2000); *Rucker v. Chater,* 92 F.3d 492, 494 (7th Cir.1996).

A claimant will automatically be found disabled if he makes the requisite showing at steps one through three. *See Henderson ex rel. Henderson v. Apfel,* 179 F.3d 507, 512 n. 3 (7th Cir.1999). If the claimant is unable to satisfy step three, he must then demonstrate that he lacks the RFC to perform his past work. *Id.* If he makes this showing, the burden then shifts to the Commissioner to establish that the claimant can engage in some other type of substantial gainful employment. *Id.*

### C. Standard of Review of ALJ Decision[6]

 Under section 405(g) a district court may affirm, modify or reverse an ALJ's decision, with or without remanding the case for a rehearing. 42 U.S.C. § 405(g). However, review of the decision is limited, and the ALJ's findings must be upheld if supported by substantial evidence. *Diaz v. Chater,* 55 F.3d 300, 305 (7th Cir.1995). Substantial evidence is such evidence as a reasonable mind would accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). In determining whether substantial evidence exists, the district court must take into account both evidence in support of a conclusion and anything that fairly detracts from its weight. *Young v. Secretary of Health and Human Services,* 957 F.2d 386, 388–89 (7th Cir.1992). The court must review all the evidence in the record, and such review " 'must be more than an

uncritical rubber stamp.' " *Delgado,* 782 F.2d at 82 (quoting *Garfield v. Schweiker,* 732 F.2d 605, 610 (7th Cir.1984)).

 The ALJ has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and determine the case accordingly. *See Richardson,* 402 U.S. at 399–400, 91 S.Ct. 1420. A reviewing federal court may not decide the facts anew, re-weigh the evidence, or substitute its judgment for that of the ALJ. *Binion on Behalf of Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997). Where conflicting evidence would allow reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the ALJ. *Id.*

 However, if the ALJ commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Id.; see also Pugh v. Bowen,* 870 F.2d 1271, 1274 (7th Cir.1989). The ALJ's decision must also demonstrate the path of her reasoning, and the evidence must lead logically to her conclusion. *Rohan v. Chater,* 98 F.3d 966, 971 (7th Cir.1996). "Even if enough evidence exists in the record to support the decision, [the court] cannot uphold it if 'the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.' " *Hodes v. Apfel,* 61 F.Supp.2d 798, 806 (N.D.Ill.1999) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996)). Finally, "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." *Rohan,* 98 F.3d at 970.

---

**6.** Where, as here, the Appeals Council declines to review an ALJ's decision, it is the decision of the ALJ that is the subject of district court review. *Eads v. Secretary of Dept. of Health and Human Services,* 983 F.2d 815, 817 (7th Cir.1993).

## III. DISCUSSION

### A. ALJ's Decision on Plaintiff's Claim

In the present case, the ALJ concluded that plaintiff's claim failed at step five. He concluded that plaintiff had a history of hypertension, hepatitis C, back pain, and mild adjustment disorder, but that his impairments did not meet the disability criteria. He found that while plaintiff may have had some pain and limitation it was less severe than plaintiff alleged, "with clear elements of exaggeration and secondary gain present." (Tr. at 20, finding 4.) The ALJ then found that plaintiff was unable to perform his past work but possessed the RFC to perform the full range of at least light work. In making the final determination, the ALJ concluded that Rule 202.21 of the Medical–Vocational Guidelines required a conclusion that plaintiff was not disabled.

### B. Plaintiff's Allegations of Error

Plaintiff alleges that the ALJ made five errors. First, he contends that at the hearing the ALJ failed to obtain a valid waiver of his right to counsel. Second, he argues that the ALJ did not assess his credibility as required by Social Security Ruling ("SSR") 96–7p. Third, he claims that the ALJ's finding that he does not suffer from a severe psychological impairment is not supported by substantial evidence. Fourth, he argues that the ALJ did not comply with SSR 96–8p in determining his RFC. Finally, he claims that the ALJ should have called a vocational expert rather than relying on the Medical–Vocational Guidelines. He requests that the matter be remanded for rehearing.

### C. Analysis of ALJ's Decision and Plaintiff's Arguments

For several reasons I conclude that the present case must be remanded for further proceedings. First, the ALJ did not obtain a valid waiver of counsel from plaintiff, and the Commissioner has not met her burden of establishing that the record was fully and fairly developed in the absence of counsel. Second, the ALJ did not comply with SSR 96–7p in his conduct of the hearing and in his decision. Finally, the ALJ failed to consider the opinion of plaintiff's treating physician.

#### 1. Waiver of Counsel and Development of Record

 "A claimant has a statutory right to counsel at disability hearings." *Thompson v. Sullivan*, 933 F.2d 581, 584 (7th Cir.1991). The claimant must be properly informed of this right and may waive it only if given sufficient information to enable him to make an intelligent decision on whether to retain a lawyer or proceed pro se. *Id.* To ensure a valid waiver of counsel an ALJ must explain (1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation on attorney fees to twenty-five percent of past due benefits and required court approval of the fees. *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir.1994).

 If the ALJ does not obtain a valid waiver, the matter must be remanded for a new hearing unless the Commissioner can establish "that the ALJ fully and fairly developed the record." *Id.* The ALJ's duty is met if he or she probes the claimant for possible disabilities and uncovers all of the relevant evidence. *Id.* If the Commissioner makes the required showing, "the plaintiff has the opportunity to rebut this showing by demonstrating prejudice or an evidentiary gap. Prejudice may be demonstrated by showing that the ALJ failed to elicit all of the relevant information from the claimant." *Id.*

 In the present case the ALJ never discussed the right to counsel with plaintiff. Plaintiff did sign a waiver of counsel form on the day of the hearing, however,

the form did not explain how an attorney could be helpful, that attorneys' fees were limited to twenty-five percent of awards, and that fees required court approval.[7] Because plaintiff was not properly advised his waiver of counsel was invalid. (In her briefs, defendant essentially concedes as much and proceeds directly to the argument that the record was fully and fairly developed.)

The problem of claimants not being properly advised of their right to counsel arises all too frequently. *See, e.g., Castrejon v. Apfel,* 131 F.Supp.2d 1053, 1056 (E.D.Wis.2001) ("Notwithstanding the clear directive of the Seventh Circuit, the administrative agency in this district apparently still fails to properly apply the law in regard to obtaining a waiver of counsel."). Moreover, the problem is not limited to this district. *See, e.g. Hodes,* 61 F.Supp.2d at 811 ("Thus, once again, the Commissioner has failed to satisfy the *Thompson* requirements, rendering the notice provided to the claimant invalid."). It is not to the administration's credit that it continues to fail to apprise social security claimants of their right to counsel despite repeated admonitions from the federal courts.

■ The absence of counsel cannot be assumed to be harmless. While ALJs may conscientiously attempt to fulfill their duties to develop the record, even the most thorough ALJ is no substitute for an advocate. An attorney will likely know beforehand the areas crucial to the claimant's case and can ensure that questioning in those areas is detailed, and that the record (both testimonial and medical) is complete. Therefore, federal courts must carefully scrutinize records developed without counsel. *See Hodes,* 61 F.Supp.2d at 810 ("En-

suring valid waiver of counsel is a paramount concern of the legal system....").

Because plaintiff's waiver of counsel was invalid, the burden shifts to defendant to show that the ALJ developed a full and fair record. Whenever a claimant is unrepresented the duty to develop a full and fair record requires the ALJ to scrupulously and conscientiously probe into, inquire of, and explore for all of the relevant evidence. *Thompson,* 933 F.2d at 585. When the claimant has not validly waived his right to counsel, this duty is heightened. *Id.* at 588.

■ In the present case the Commissioner has not met her burden. The hearing was brief, almost perfunctory, lasting barely one-half hour. The ALJ's questioning of plaintiff was deficient in several critical respects. Plaintiff alleged that pain was a substantial factor in his disability. Yet the ALJ asked plaintiff no questions about his pain. He did not inquire about the location, duration, frequency, or intensity of plaintiff's pain or about the factors that precipitated it. Further, he asked no questions about how plaintiff attempted to alleviate pain or other symptoms.

The Seventh Circuit has instructed that: If the allegation of pain is not supported by the objective medical evidence in the file and the claimant indicates that pain is a significant factor of his or her alleged inability to work, then the ALJ must obtain detailed descriptions of claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. She must investigate all avenues presented that relate to pain, including claimant's prior work record information and observations by treating physicians, examining physi-

---

**7.** In her recommendation, the magistrate judge mentions correspondence from the administration and the ALJ to plaintiff touching on the right to counsel. However, as the magistrate judge correctly concluded, even considering these documents, plaintiff was not fully advised of his right to counsel.

cians, and third parties. Factors that must be considered include the nature and intensity of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities.

*Luna v. Shalala,* 22 F.3d 687, 691 (7th Cir.1994) (citations omitted). By failing to elicit any testimony about pain, the ALJ violated the Seventh Circuit's mandate.

The ALJ's failure in this regard is particularly troubling in view of his statement that plaintiff exaggerated his symptoms for "secondary gain." (Tr. at 20.) It is unclear from the record on what this statement is based, and the ALJ does not explain in his decision how he reached this conclusion.

Finally, in the areas that he did cover, the ALJ's questioning was hardly probing. He did not ask follow up questions about the effects of plaintiff's fatigue or about how his mental and emotional problems affected his ability to work. He did not explore whether the side-effects of medication, of which plaintiff complained, affected plaintiff's ability to work. If plaintiff had been represented by counsel a more complete record on these issues would almost certainly have been developed.

Defendant argues that the ALJ fully developed the record and lists the areas that he covered. However, absent exploration of the issues mentioned above the record is incomplete. *Meroki v. Halter,*

2001 WL 668951, at *11 (N.D.Ill. June 14, 2001) ("The fact that the ALJ fully and fairly developed the record in *some* areas does not establish that the ALJ did so in *all* critical areas.").

Defendant also argues that plaintiff has not pointed to specific facts that were not brought out at the hearing. Even if this were so, defendant's argument has it backwards. When a claimant's waiver of counsel is invalid, the burden of showing that the record has been fully developed shifts to the Commissioner. The Commissioner cannot fulfill that burden by arguing that the *claimant* has not brought forth "missing evidence." *Young v. Apfel,* 1999 WL 325026, at *9, 1999 U.S.Dist. LEXIS 7616, at *28 (N.D.Ind. May 19, 1999). The plaintiff need only present such evidence *after* the Commissioner has met her burden. *Binion,* 13 F.3d at 245. The Commissioner has not done so here.

Because the hearing was perfunctory and the ALJ's inquiries superficial, defendant has not met her burden of demonstrating that the record was fully and fairly developed. Thus, the case must be remanded. *See Hodes,* 61 F.Supp.2d at 811 (remanding case where ALJ collected an abundance of medical evidence "but held a perfunctory hearing during which he failed to adequately probe into the evidence"); *Young,* 1999 WL 325026 at *9, 1999 U.S.Dist. LEXIS at *28 (remanding case where, although ALJ received and reviewed extensive medical records, he failed to inquire in any depth about claimant's condition, medication, or physical capabilities);[8] *Moore v. Apfel,* 1999 WL

---

**8.** While the ALJ's decision in this case includes a detailed discussion of the medical records, in some instances he misstates the evidence. For example, the ALJ indicates that the December 30, 1997 CT scan of plaintiff's back "showed only mild disc bulging and degenerative changes with nothing to suggest any herniation or nerve root compromise." (Tr. at 13.) In fact, the radiology report indicates that there "is mild disc bulging at L4–5 with moderate disc bulging at the L5–S1 level." (Tr. at 151.) It further indicates: "There are moderately prominent degenerative posterior facet changes bilaterally at the L4–5 and L5–S1 levels." (Tr. at 151.) The ALJ also wrote that a February 5, 1999 note from Froedert Hospital indicates that plaintiff's hypertension medication—Lotrel—had

261927, at *2 (N.D.Ill. Apr. 26, 1999) (remanding case where ALJ failed to fully explore effects of plaintiff's conditions and side effects of medication). Although remand is appropriate on this ground alone, there are additional reasons to send this case back for further proceedings.

### 2. The ALJ Did Not Comply With SSR 96–7p

The ALJ also failed to comply with the requirements of SSR 96–7p, 1996 WL 374186. The Ruling sets forth criteria for assessing the credibility of a claimant's statements about his symptoms and their effects. Specifically, it requires the ALJ to consider (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate or aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of medication; (5) treatment other than medication the person receives for pain or other symptoms; (6) any measures other than treatment the person has used to relieve pain; and (7) any other factors concerning the person's functional limitations and restrictions due to pain or other symptoms. *Id.* at *3.

The Ruling also states that in setting forth the decision it is not enough for the ALJ to make a conclusory statement such as "the allegations have been considered," or "the allegations are (or are not) credible." *Id.* at *2. Neither is it sufficient to simply set forth the factors described in

the regulations. *Id.* Rather, the decision must set forth the "specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* The ruling essentially restates the requirement that ALJs build an accurate and logical bridge from the evidence to the conclusion, and that they state which of a claimant's complaints are being rejected and why such complaints were unsupported by the record. *See Novak v. Barnhart*, 180 F.Supp.2d 990, 1001 (E.D.Wis.2001) (citing *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir.2000); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996)).

■■■ In this case, the ALJ failed to comply with SSR 96–7p in both his conduct of the hearing and in his decision. As was explained in section C.1., *infra*, the ALJ failed to question plaintiff in several key areas covered by the Ruling. Moreover, he did not address those areas in his decision. Instead, he dismissed plaintiff's testimony with the conclusory statement: "While claimant may have some degree of pain and limitation it is not as severe or limiting as he has alleged with clear elements of exaggeration and secondary gain present." (Tr. at 20, finding 4.) However, the ALJ never explained why he believed plaintiff's description of his symptoms was not credible or what evidence supported his view that plaintiff overstated his im-

been discontinued on December 22 (the implication being that plaintiff's high BP reading on February 5 was the result of plaintiff being off medication). However, the February 5 note seems to indicate that Lotrel was discontinued on January 22, 1999, not December 22, 1998. (Tr. at 258.) The ALJ also wrote that plaintiff "acknowledged that he had 'problems' with the doctor (see entry as of October 8, 1998 in Exhibit 9F)." (Tr. at 18.) However, this entry states: "Believe pt has

issue with myself. Offered him to see one of the other doctors. At issue is my desire to work out problems as much as I can & as is reasonable in the office prior to referral to specialist. His is to see a specialist right away and for anything." (Tr. at 233.) Finally, the ALJ wrote that plaintiff does all the housework, citing exhibit 4F. (Tr. at '19.) However, exhibit 4F consisted of medical records from St. Luke's Hospital. (Tr. at 168–83.)

pairments to obtain benefits. *See Steele v. Barnhart*, 290 F.3d 936, 941–42 (7th Cir. 2002) (holding that an ALJ may not, consistent with SSR 96–7p, dismiss a claimant's description of impairments in a single sentence).

The ALJ's accusation in finding 4 that plaintiff overstated his impairments is all the more confusing when coupled with finding 5—that plaintiff is unable to perform his past relevant work. If plaintiff's impairments indeed were severe enough to have prevented him from performing his past work, including the relatively "light" security guard position, it is difficult to understand the basis for the ALJ's accusation. When an ALJ finds that a claimant is fabricating symptoms to obtain benefits he should provide a clear explanation of why he reaches such a conclusion, and he must comply with the requirements of SSR 96–7p. *Cf. Dyson v. Massanari*, 149 F.Supp.2d 1018, 1026–27 (N.D.Ill.2001) (remanding case pursuant to SSR 96–7p where ALJ stated that claimant was "generally credible, but not to the extent alleged"). For this reason as well, the matter must be remanded.

### 3. The ALJ Did Not Consider the Opinion of Plaintiff's Treating Physician

 Dr. Crawley's October 19, 1998 report indicates that plaintiff "will be seriously impaired and unable to work or return to normal functioning for at least 12 months." (Tr. at 95.) "Treating source opinions must be given special consideration." *Dominguese v. Massanari*, 172 F.Supp.2d 1087, 1100 (E.D.Wis.2001). If it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence, the adjudicator must give it controlling weight. *Id.* (citing SSR 96–8p). While an ALJ need not award benefits "simply because a physician finds that the claimant is 'disabled' or 'unable to work,'" *Clifford*, 227 F.3d at 870, an ALJ may never totally ignore such evidence. *Castrejon*, 131 F.Supp.2d at 1057 (" '[T]he notice of determination or decision must explain the consideration given to the treating source's opinion(s).' ") (quoting SSR 96–5p).[9]

The ALJ never discussed Dr. Crawley's report and thus failed to comply with the rules cited. Therefore, the matter must be reversed and remanded for this reason as well. *See Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir.1991) (holding that social security rulings are binding on ALJs and that failure to comply with such rulings requires reversal and remand).[10]

### IV. CONCLUSION

For the foregoing reasons I decline to follow the recommendation of the magistrate judge; and

**IT IS HEREBY ORDERED THAT** the decision of the Commissioner is **REVERSED,** and this matter is **REMANDED** to the administration for rehearing consistent with this opinion.

---

9. *See also id.* ("When the decision is a denial, 'the notice of the determination on decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.' ") (quoting SSR 96–2p).

10. Because the case must be remanded for the reasons stated, I need not address plaintiff's other objections.