Michael D. HENDERSON, by Doris HENDERSON, Plaintiff–Appellant,

v.

Kenneth S. APFEL, Commissioner of Social Security, Defendant–Appellee.

No. 98–2946.

United States Court of Appeals, Seventh Circuit.

Submitted Jan. 27, 1999.*

Decided March 31, 1999.

---

* On January 26, 1999, we granted Ms. Henderson's motion to waive oral argument.

Consequently, the appeal is submitted on the briefs and the record. *See* Fed. R.App. P. 34(a); Cir. R. 34(f).

Steven R. Jacobs (submitted), Indianapolis, IN, for Plaintiff–Appellant.

Judith A. Stewart, Office of the United States Attorney, Indianapolis, IN, Grace M. Kim, Social Security Administration, Office of the General Counsel, Region V, Chicago, IL, for Defendant–Appellee.

Before ESCHBACH, FLAUM and MANION, Circuit Judges.

FLAUM, Circuit Judge.

At issue in this appeal is whether an Administrative Law Judge ("ALJ") properly determined the onset date of a social security claimant's disability without the assistance of a medical advisor. The claimant, Michael Henderson, applied for disability insurance benefits ("DIB"), alleging that he was disabled due to hepatitis-C and osteoarthritis affecting his hips. After conducting hearings, the ALJ found that Henderson was disabled within the meaning of the Social Security Act (the "Act"), 42 U.S.C. § 423(d), but only as of September 7, 1995. Michael's wife, Doris, appeals,[1] arguing that there is not substantial evidence in the record to support the ALJ's findings. We affirm.

## I. Background

Henderson worked as a maintenanceman and groundsman until April 15, 1992, when he left work at age 49 because of back problems. Other, more serious maladies soon surfaced. From April to December 1992, Henderson was treated by Dr. Farr for a liver condition and pain in his back, shoulders and wrists. As early as May 1992, liver biopsy and other test results were positive for both alcoholic liver disease and hepatitis-C.[2] Dr. Farr treated Henderson's complaints with Tylenol, Advil and Motrin. Dr. Farr noted that Henderson had a history of substance abuse, including cocaine, marijuana and heavy alcohol consumption.

Henderson applied in July 1992 for DIB, claiming that he was disabled because of

hepatitis-C and arthritis affecting his hips. In his application, Henderson reported that since stopping work in April, he had performed household tasks such as cooking meals, washing dishes, folding laundry and grocery shopping. He also reported that, while he had not consumed alcohol since May, he continued to smoke marijuana daily. Henderson's application was denied both initially and on reconsideration.

In December 1992, Henderson was examined by Dr. Meisenheimer, a consultative physician, who reported that Henderson appeared to be feeling better, and that his liver condition showed improvement. Dr. Meisenheimer also indicated that Henderson did not have any serious liver disease complications. Henderson, however, subsequently began experiencing hip pain while climbing stairs and doing other activities, and accordingly was examined in March 1993 by physicians at Methodist Hospital of Indiana. The reviewing radiologist concluded that based on pelvic x-rays Henderson had "near bone-on-bone articulation of the left hip," and deterioration of cartilage between the bones ("joint space narrowing"), consistent with rheumatoid arthritis and secondary superimposed osteoarthritis. One of Henderson's treating physicians noted that Henderson had a "significant" decrease in the internal rotation of his hips, recommended Tylenol and opined that Henderson had osteoarthritis of the hips.

Henderson began treatment with another physician, Dr. Applegarth, in March 1993 for both arthritis and hepatitis. In September 1993, Dr. Applegarth noted that Henderson's liver tests were positive for chronic hepatitis-C. Dr. Applegarth concluded that hepatitis most likely did not cause Henderson's arthritic symptoms. Instead, the doctor opined, the symptoms were more consistent with secondary osteoarthritis. At that time, Dr. Applegarth

---

1. Ms. Henderson was substituted as the claimant after Mr. Henderson died.

2. Hepatitis–C is a viral disease that causes inflammation of the liver and generally results in chronic liver disease.

found no limitation of hip movement. In March 1994, a rheumatologist at Wishard Memorial Hospital in Indianapolis, Indiana confirmed Dr. Applegarth's diagnosis of osteoarthritis. While Henderson apparently complained to the rheumatologist that his hip problems were "getting much worse," he also reported that he continued to play "a lot" of basketball and ran in place for exercise. He also indicated in a follow-up examination in November 1994 that he remained "active" and played basketball. However, Henderson's hip problems persisted, and he ultimately underwent hip replacement surgery in March 1995. There were no post-surgical complications, and Henderson was reported by May 1995 to have good hip strength and able to "ambulate well." Within five months of the operation, Henderson was walking without a limp or other limitation.

At the same time, doctors continued to monitor Henderson's liver condition. An ultrasound of his liver taken at the end of August 1995 indicated that although the liver was normal in size, it had a suspicious mass in its right lobe. The ultrasound did not, however, reveal any evidence of ascites, which is an accumulation of clear body fluid in the abdominal cavity. Henderson's liver condition worsened steadily until, on September 7, 1995, doctors at Wishard advised Henderson not to seek work until after his next examination in January 1996. On September 18, a CT-scan revealed signs of a tumor on the liver. Henderson's condition deteriorated catastrophically in the two months that followed. On November 6, 1995, he was admitted to the Wishard emergency room after vomiting blood. He was diagnosed as having severe upper gastrointestinal bleeding caused by the deterioration of his liver, which was treated primarily with blood transfusions. Henderson died from massive internal bleeding in February 1996.

Between 1994 and 1996, an ALJ conducted three hearings to determine whether Henderson was disabled. At the first hearing in February 1994, both Henderson and his wife testified. Henderson testified that he experienced leg and hip pain beginning some time in 1993, but did not require ambulatory assistance. He further testified that he was most comfortable standing, and could do so for an hour at a time, and could walk from eight to thirty blocks at a time. A self-described "workaholic," Henderson stated that he busied himself during weekdays with household chores, including washing dishes, making beds, sorting, washing and folding laundry and cleaning bathrooms. He further testified that he mowed the lawn and had started to paint his two-story house over the summer. Ms. Henderson confirmed that her husband cleaned the house, drove a car without difficulty and played with his three children. She also testified, however, that he could not lift anything heavy.

At the second hearing in March 1995, Henderson and a vocational expert testified. Henderson noted that his overall condition had deteriorated since the first hearing, and that he used a walking cane on a daily basis. He stated that he was scheduled to undergo hip replacement surgery in a matter of days, and complained of pain in his hands, wrists and arms. Henderson also testified that he had taken interferon for six months for his liver condition, but was no longer taking it, and that his doctors had instructed him to return every six months for an examination and blood test. The vocational expert testified that Henderson's impairment rendered him unable to return to his previous job, but that he could perform other light unskilled jobs. The ALJ deferred ruling on the case until after Henderson's hip replacement surgery had been performed.

At the final hearing in January 1996, no testimony was taken, but Henderson's attorney indicated that Henderson had become dependent on blood transfusions because of internal bleeding and that his condition was unstable.

In March 1996, the ALJ rendered his decision, finding that Henderson became

disabled[3] beginning on September 7, 1995, the date when Wishard doctors advised Henderson to stop working. The ALJ thus found that, although Henderson had not engaged in substantial gainful activity since April 15, 1992, his condition nonetheless did not leave him disabled because it did not meet or equal any of the impairments that the Social Security Administration has determined automatically render an individual "disabled" within the meaning of the Act. See 20 C.F.R. pt. 404, subpt. P, app. 1 (the "Listings"). Moreover, the ALJ found that prior to September 7, Henderson's residual functional capacity—his capacity for work given his impairment—permitted him to perform the full range of light work, and thus that he was not disabled before that date within the meaning of the Act. The Appeals Council denied Henderson's request for review, rendering the ALJ's decision the final decision of the Commissioner of Social Security. The district court held that all of the ALJ's findings were supported by substantial evidence, and accordingly affirmed.

## II. Analysis

On appeal, Ms. Henderson argues that: (a) the ALJ's finding as to the date that her husband became disabled is not supported by substantial evidence; (b) the ALJ should have sought the advice of a medical expert to determine the onset date of Henderson's disability; (c) the ALJ's finding that Henderson did not meet Listing 1.03(A) is not supported by substantial evidence; and (d) in determining the onset date of the disability, the ALJ ignored contrary evidence and relied on evidence outside the record.

This court will sustain the ALJ's findings if they are supported by substantial evidence. See Nelson v. Apfel, 131 F.3d 1228, 1234 (7th Cir.1997). In reviewing the ALJ's findings, we may not "decide facts anew, reweigh the evidence, or substitute our judgment for that of the ALJ." Id. While a scintilla is insufficient to support the ALJ's findings, no more evidence is required than "such evidence as a reasonable mind might accept as adequate to support a conclusion." Diaz v. Chater, 55 F.3d 300, 305 (7th Cir.1995) (internal quotation marks omitted). In assessing the correctness of the onset date determined by the ALJ, "the issue is whether there is substantial evidence in the record to support the date chosen by [the ALJ], not whether an earlier date could have been supported." Stein, 892 F.2d at 46.

### A. Onset Date

The Social Security Administration has established the method by which an ALJ is to determine the onset date of a disability. See S.S.R. 83–20 (1983). The

---

**3.** In making his findings, the ALJ followed the established five-step sequential process for evaluating whether a claimant is "disabled" under the Act. The burden is on the claimant to show that she is unable to engage in any substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or that can be expected to last for a continuous period of not less than 12 months or can be expected to result in death. 42 U.S.C. § 423(d)(1)(A).

Under the five-step process, the ALJ considers first whether the claimant is engaged in a "substantial gainful activity." 20 C.F.R. § 404.1520(b). If not, the ALJ considers whether the claimant has an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities." Id.

§ 404.1520(c). If so, the ALJ determines whether the impairment meets or equals any of the Listings found in the regulations. See id. pt. 404, subpt. P, app. 1. If the claimant's impairment is found to meet or equal one of the Listings, the claimant is deemed disabled. See id. § 404.1520(d). If not, the ALJ determines the claimant's residual functional capacity. If the ALJ finds that the claimant's residual functional capacity does not allow the claimant to perform past relevant work, the burden shifts to the Social Security Administration to prove that in light of the claimant's age, education, job experience and functional capacity to work, the claimant is capable of performing other work and that such work exists in the national economy. See Stein v. Sullivan, 892 F.2d 43, 44 n. 1 (7th Cir.1990).

ALJ is to consider: (1) the claimant's allegations as to the onset date; (2) the date that the claimant left work; and (3) medical evidence of onset. *See id.*; *Nolen v. Sullivan*, 939 F.2d 516, 519 (7th Cir.1991). Medical evidence is the most important factor, and the chosen onset date must be consistent with it. *See Lichter v. Bowen*, 814 F.2d 430, 434 (7th Cir.1987). With slowly progressing impairments, an onset date must often be inferred, especially when adequate medical records are not available. *See Nolen*, 939 F.2d at 519. Although an ALJ generally should consult a medical advisor to make this inference, such consultation is unnecessary when the claimant's medical chronology is complete. *See Pugh v. Bowen*, 870 F.2d 1271, 1278 n. 9 (7th Cir.1989).

■ We believe the onset date determined by the ALJ is supported by substantial evidence. Ample evidence shows that, prior to September 7, 1995, Henderson did not have an impairment or combination of impairments that met or equaled any Listing, and that his residual functional capacity before that date allowed him to perform light work. Substantial evidence supports the ALJ's finding that as of September 7, 1995, Henderson's condition met Listing 5.02, which covers gastrointestinal hemorrhaging due to undetermined causes, and Listing 5.05, which includes chronic liver disease combined with serious complications such as varices (enlarged arteries or veins), ascites or other severe liver dysfunction. *See* 20 C.F.R. pt. 404, subpt. P, app. 1. Prior to September 7, 1995, by contrast, there is no evidence of a tumor or serious complications associated with hepatitis-C or chronic liver disease such as internal bleeding. In particular, while the physicians who examined and treated Henderson diagnosed his condition as hepatitis-C and chronic liver disease, they also noted no conditions that implicated the Listings. Consequently, the ALJ's determination of the onset date of Henderson's disability is supported by substantial evidence in the record.

## B. Need for a Medical Advisor

■ We disagree with Ms. Henderson's contention that the ALJ erred in not eliciting testimony from a medical advisor to determine the onset date of her husband's disability. The ALJ already had an extensive medical history before him. An ALJ does have a duty to develop a "full and fair record," *Howell v. Sullivan*, 950 F.2d 343, 348 (7th Cir.1991), and must therefore consult a medical advisor in situations involving incomplete medical histories where an onset date must be inferred, *see Pugh*, 870 F.2d at 1278 n. 9. But here the medical evidence is complete, and the evidence does not suggest a clear alternative date to that determined by the ALJ. Moreover, the ALJ's chosen date is in fact supported by substantial evidence in the record.

## C. Listing 1.03(A) Determination

■ Ms. Henderson's challenge to the ALJ's finding that her husband's condition never met or equaled Listing 1.03(A) must also fail because the finding is supported by substantial evidence. Listing 1.03(A), which the ALJ explicitly referred to in concluding that Henderson did not have a "marked inability to stand or walk," covers arthritis in a major joint combined with marked limitation of motion or abnormal motion in the joint and bone destruction or joint space narrowing. *See* 20 C.F.R. pt. 404, subpt. P, app. 1. As Ms. Henderson correctly asserts, her husband's doctors concluded in March 1993 that there was "near bone-on-bone articulation" in his left hip and "joint space narrowing." Even so, there is ample evidence in the record to support the ALJ's finding that Henderson did not meet the other elements of Listing 1.03(A). Specifically, the evidence suggests that Henderson's hip impairment did not markedly limit his ability to walk or stand. Although a physician at Methodist Hospital, Dr. Cohen, whom Dr. Farr con-

sulted in 1993 while monitoring Henderson's hip condition, noted a "significant decrease in internal rotation to the hips bilaterally" in March 1993, especially in Henderson's left hip, the physician who treated Henderson's osteoarthritis found no limitation of movement in Henderson's hips. Moreover, at the February 1994 hearing, Henderson testified that he required no ambulatory aids, walked from eight to thirty blocks at a time and could stand for an hour at a time. Henderson further testified that, despite some difficulty, he was able to perform household chores such as washing dishes and doing laundry, mowed the lawn regularly and had even started to paint his two-story house the previous summer. A March 1994 assessment again showed that Henderson's hips had "a good range of motion bilaterally," although Henderson reported some pain in the groin area. Additionally, Henderson's doctors noted his solid recovery in the months immediately following his hip replacement surgery. Thus, substantial evidence supports the ALJ's finding that Henderson's hip impairment did not at any time meet or equal Listing 1.03(A).

Moreover, although the ALJ did not specifically address subsection (B) of the Listing, the Commissioner is correct that the record amply supports the ALJ's implicit conclusion that Henderson did not meet or equal that subsection. Listing 1.03(B) includes arthritis that markedly reduces the victim's ability to walk or stand, combined with reconstructive surgery that does not, or is not expected to, result in recovery of full weight-bearing capacity in the affected joint within one year of the arthritic condition's onset. *See* 20 C.F.R. pt. 404, subpt. P, app. 1. Henderson's hip impairment does not satisfy these elements because there is evidence that, within five months of undergoing hip replacement surgery, his hip had returned to full weight-bearing status.

### D. ALJ's Review of the Evidence

Nor is there any merit to Ms. Henderson's contention that the ALJ ignored contrary evidence and cited evidence not in the record. Ms. Henderson cites three reports prepared in 1992 in which Dr. Farr concluded that Henderson was disabled. While it is true that an ALJ may not ignore an entire line of evidence that is contrary to her findings, *see Diaz*, 55 F.3d at 307, she also "need not provide a complete written evaluation of every piece of testimony and evidence," *id.* at 308. An ALJ need not give controlling weight to a treating physician's opinion if it is not supported by objective clinical findings. *See* 20 C.F.R. § 404.1527(d); *see also Nelson*, 131 F.3d at 1237 (an ALJ should consider and discuss medical evidence that is "credible, supported by clinical findings, and relevant"). Dr. Farr's reports present no clinical findings of a disability that meets or equals any of the Listings, and do not contradict the ALJ's finding that Henderson's residual functional capacity permitted him to perform light work. Moreover, it is clear, as the Commissioner argues, that the ALJ's reference to an "Ex. B at 5", which is not in the record, is nothing more than a typographical error. The ALJ's reference recites the medical findings in Exhibit B–5, the report of Henderson's recovery five months after his hip replacement surgery.

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.