**Jacqueline KILPS, Plaintiff,**

v.

**Jo Anne BARNHART, Commissioner of the Social Security Administration, Defendant.**

**No. 01 C 1270.**

United States District Court, E.D. Wisconsin.

March 2, 2003.

David Dreis, Milwaukee, WI, for Plaintiff.

Lennie Lehman, Penelope C. Fleming, U.S. Dept. of Justice, Office of U.S. Atty., for Defendant.

## DECISION AND ORDER

ADELMAN, District Judge.

Plaintiff Jacqueline Kilps ("plaintiff") brings this action under 42 U.S.C. § 405(g) seeking judicial review of the decision of defendant Jo Anne Barnhart, Commissioner of the Social Security Administration ("defendant" or "the Commissioner"), denying her application for disability insurance benefits under the Social Security Act. The action was assigned for pretrial purposes to Magistrate Judge Patricia A. Gorence, who recommended that the decision be affirmed. *See* 28 U.S.C. § 636(b)(1). Plaintiff objected to the recommendation, and the matter is before me for decision.

## I. DISABILITY STANDARD

Under the Social Security Act, a person is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security regulations prescribe a sequential five-step test for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. Under this test the Administration must determine: (1) whether the claimant is presently unemployed. (2) if so, whether the claimant has a severe impairment or combination of impairments; (3) whether any of the claimant's impairments are listed by the Social Security Administration as being so severe as to preclude substantial

gainful activity;[1] (4) if not, whether the claimant possesses the residual functional capacity ("RFC") to perform her past work; and (5) if not, whether the claimant is able to perform any other work in the national economy in light of her age, education and work experience. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir.2000); *Rucker v. Chater*, 92 F.3d 492, 494 (7th Cir.1996).

A claimant will automatically be found to be disabled if she makes the requisite showing at steps one through three. *See Henderson ex rel. Henderson v. Apfel*, 179 F.3d 507, 512 n. 3 (7th Cir.1999). If the claimant is unable to satisfy step three, she must then demonstrate that he lacks the RFC to perform his past work. *Id.* If she makes this showing, the burden then shifts to the Commissioner to establish that the claimant can engage in some other type of substantial gainful employment. *Id.* The Commissioner may carry this burden either by relying on the testimony of a vocational expert, who evaluates the claimant's ability to perform work in the national economy in light of her limitations, or through the use of the "Medical–Vocational Guidelines," commonly referred to as "the Grid," *see* 20 C.F.R. Pt. 404, Subpt. P, App. 2. *See Heckler v. Campbell*, 461 U.S. 458, 461, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983).

## II. FACTS AND BACKGROUND

### A. Plaintiff's Application

Plaintiff filed an application for disability benefits on February 15, 2000, and alleged disability due to bulging and herniated discs in the lower back and neck and a herniated stomach muscle with an onset date of September 29, 1999. (Tr. at 75.)[2] Her claim was denied on April 19, 2000. She sought reconsideration and her claim was denied again on September 16, 2000. She then requested a hearing before an Administrative Law Judge ("ALJ"). On April 4, 2001, she appeared before ALJ Margaret J. O'Grady. In a decision dated July 24, 2001, ALJ O'Grady denied plaintiff's application for benefits.

Plaintiff appealed this decision to the Appeals Council and also reapplied for benefits. The Appeals Council denied review; however, in evaluating plaintiff's reapplication, the Social Security Administration found plaintiff disabled as of October 1, 2001. Plaintiff then filed the action now before me. Because plaintiff was found disabled as of October 1, 2001, this action addresses only whether she was disabled during the period from September 29, 1999 to the date of the ALJ's decision.[3]

### B. Hearing Testimony

#### 1. Plaintiff's Testimony

At the hearing before ALJ O'Grady, plaintiff testified that she was thirty-nine years old, had completed the eleventh grade and currently lived with her husband. She was employed by Dynapro Film Products until September 1999, when she had to leave her position due to persistent pain.[4] During her last year at Dynapro, plaintiff only worked three days a

---

1. These impairments are listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("the Listings").

2. Citations to the administrative record are designated "Tr. at ___." Citations to papers filed in this court are designated "R. ___ at ___."

3. Plaintiff's brief seems to indicate that this appeal addresses whether she was disabled from September 1999 until September 30, 2001. However, my task is to review the ALJ's decision, which issued on July 24, 2001. Thus, this action does not address whether plaintiff was disabled during the period between July 25 and September 30, 2001.

4. The record contains conflicting evidence about whether plaintiff left her work in September 1999 or January 2000.

week and her duties were reduced due to her inability to lift. However, even performing more limited, part-time work, plaintiff experienced pain in her fingers due to the repetitive, fine manipulations required of her job.

Plaintiff testified that she suffers from chronic pain. She stated that almost every day she experiences pain in her lower back, pain and muscle spasms in her upper back and pain in her left leg, sometimes only in the thigh and other times extending from the thigh to the ankle. To relieve the pain she must lie down and raise her legs, and sometimes apply heat. The pain varies in its level of intensity and in the length of time it lasts. She also experiences pain in her neck, particularly after looking up or down. She testified that she has had neck pain daily for the last few weeks, but previously had neck pain only a few times a week. She experiences pain in her shoulders every few weeks and abdominal pain when lifting. She takes Propoxyphene two to three times per month, Tylenol "a couple of times a week," and Norgesic. (Tr. at 34.)

Plaintiff was questioned about her daily activities. She stated that she spends her days reading or watching television. She is able to bathe, shower and dress herself, but sometimes needs assistance tying her shoes due to her difficulty bending. She testified that she cooks, washes dishes but finds it painful. She also does laundry. However, she stated that she does not have to carry a laundry basket; she simply puts the clothes into the machine and turns it on. She cannot sweep or vacuum because she has difficulty pushing or pulling. She also does not garden or grocery shop alone because she cannot reach, push or pull. She stated that she does not take out the trash, except for small items.

The ALJ questioned plaintiff about her ability to perform various exertional acts. Plaintiff testified that some days she can walk for only five minutes, while other days she can walk for an hour. She stated that she can stand and sit for less than one hour. She also stated that, although her doctor said that she could lift five pounds occasionally, she tries to lift less because lifting is painful. She said, for example, she will not buy a gallon of milk, which she finds too heavy to lift, but only half-gallons. She testified that she can bend at the knees, but not the waist and can climb stairs. She also stated that she can use her hands and fingers to manipulate objects, but cannot perform repetitive manipulations.

### 2. Vocational Expert's Testimony

Also present at the hearing was vocational expert ("VE") Beth Hoynik. She categorized plaintiff's work during her last year at Dynapro as sedentary and before that as light work requiring a skill level of between two and three. She further testified that plaintiff's employment before Dynapro would be categorized as light and medium work with skill levels of three and four.

The ALJ asked the VE to imagine the following person: someone who was forty years old, had completed the eleventh grade and had the same vocational history as plaintiff, could work at a medium exertional level, could not bend, twist, push or pull and could only occasionally squat, crawl or climb. The ALJ then asked whether the person could perform her past work. The VE opined that she could not. The ALJ then asked whether she could perform any other work. The VE opined that she could perform "sedentary assembly type" jobs, of which there were 1,000 in the Milwaukee area, "hand packaging type work," of which there were 500 jobs in the Milwaukee area and sedentary cashier work, of which there were 800 jobs in the Milwaukee area. (Tr. at 48.)

The ALJ then added additional restrictions and asked the VE what effect they would have on the individual's ability to perform the jobs previously described. The VE opined that the need for a sit-stand option would have no effect, as long as the individual only needed to change positions for a few seconds. Inability to reach overhead also would not change the result. However, inability to reach out would decrease the number of available jobs by about fifteen percent. Inability to perform fine manipulation on a repetitive basis would "eliminate approximately 85 percent of the jobs ... quoted ... originally." (Tr. at 49.)

The VE stated that if all the above-mentioned limitations were present, there would be no jobs that the person could perform in the competitive market. The ALJ asked about whether someone with all the above limitations could be a surveillance monitor or ticket-taker. The VE did not state expressly whether the person could perform those jobs, but stated that there were about 300 surveillance monitor positions in the Milwaukee area and 240 ticket-taker positions.

## C. Medical Evidence

The medical evidence reveals that plaintiff has a history of hiatal hernia and chronic discogenic back pain and back spasms leading to chronic fibromyositis, for which she has been treated by Dr. Suresh Misra. Plaintiff's treatment records begin in September 1997, when she saw Dr. Misra five times. On September 5, plaintiff reported experiencing sharp pains in the upper abdominal region, back and rib cage after performing certain repetitious tasks at work. Dr. Misra prescribed Naprelan and instructed plaintiff not to work and to apply cold then hot compresses. (Tr. at 173–74.) On September 10, plaintiff reported some improvement. Examination revealed tenderness over the rib cage, mid back and upper abdomen and no neurological deficits. (Tr. at 172.) On September 15, she reported having spasms even when doing the dishes. These were relieved by rest. (Tr. at 171.) On September 19, plaintiff reported continued, intermittent pain and spasms. Dr. Misra's notes indicate that plaintiff was going to try to return to work part-time, working eight hours a day on Mondays, Wednesdays and Fridays. (Tr. at 170.) On September 25, plaintiff reported feeling better after taking anti-inflammatory medication. She had returned to work and said that she had some tenderness after an eight-hour day, but felt seventy-five percent better. (Tr. at 169.)

Dr. Misra imposed certain permanent work restrictions. (Tr. at 143.) The document indicating these restrictions is not dated; however, it appears to have been completed in or around September 1997. Dr. Misra stated that plaintiff can work forty hours per week, eight hours per day. She needs to be able to alternate between standing, walking and sitting and cannot bend, twist, squat, push or pull. She can occasionally lift no more than five pounds and occasionally reach.

The medical records indicate that plaintiff saw Dr. Misra two more times before the end of 1997 and then did not see him again until October 27, 1998, when she reported shoulder and neck pain (Tr. at 166). Dr. Misra prescribed Parafon Forte.

On December 11, 1998, plaintiff saw Dr. Misra and reported experiencing sudden, intense pain and spasms in her mid back on the left side and severe pain in her lower back. (Tr. at 165.) She applied ice, which helped, as did lying down. However, bending increased the pain. Dr. Misra prescribed Naprelan and instructed plaintiff to do back strengthening exercises.

Plaintiff saw Mr. Misra again on March 9, 1999, for chronic back pain and intermittent spasms in the lower back. (Tr. at

163.) Plaintiff was taking Parafon Forte for the spasms and was "comfortable with the conservative medical management." She had no radiation of pain down to the lower extremities.

On July 12, 1999, plaintiff reported having experienced neck and shoulder pain for two days. (Tr. at 155.) Dr. Misra noted no tenderness around the spine, but pain around the shoulder blade. He again prescribed Naprelan and instructed plaintiff in home physical therapy.

On June 14 and 15, 1999, plaintiff was seen by Dr. Misra for abdominal pain and nausea, for which she previously had been prescribed Prevacid. (Tr. at 158–60.) He ordered an abdominal and upper gastointestinal ultrasound, which was then performed by Dr. Robert Cronin. Dr. Cronin concluded that plaintiff had a small, sliding hiatal hernia in the distal esophagus.

Plaintiff saw Dr. Misra again on July 21, 1999 and said that she still had pain in her neck and shoulder, but felt better. (Tr. at 155.) Dr. Misra noted no tenderness around the spine, upper back or trapezious and "minimal discomfort" at trigger points.

Plaintiff saw Dr. Misra every month from September to November. His notes for each visit show upper back pain and stiffness and lower back spasms. (Tr. at 150, 152, 154.) Dr. Misra noted no radiculopathy, prescribed Naprelan and recommended a conservative course of treatment. (Tr. at 150.)

In December, plaintiff saw Dr. Misra three times. On December 8, she reported that her lower back pain had increased. (Tr. at 150.) Dr. Misra noted that plaintiff had sciatica intermittent radiculopathy and a herniated disk and had been missing work. On December 13, 1999, she complained of having experienced a three to four day period of increased pain over her right upper back shoulder blade, neck and right arm and pain when reaching out. (Tr. at 148.) Dr. Misra noted occasional

numbness in the hand, arranged for plaintiff to begin physical therapy, prescribed Naproxen, and instructed her not to do any lifting, pulling or pushing. On December 29, plaintiff again complained of pain in her upper back and shoulder blades. (Tr. at 147.) Dr. Misra noted no edema or neurological deficits.

On January 16, 2000, plaintiff went to the emergency room complaining of a severe headache. (Tr. at 129.) She was discharged and instructed to rest in a dark room, support her head and neck with pillows and move as needed and to follow-up with her physician. (Tr. at 130.) The next day, plaintiff saw Dr. Misra and reported pain in her lower back, neck and head. (Tr. at 147.) He noted that she was experiencing no numbness in the leg and prescribed Darvoset.

In December 1999 and January 2000, plaintiff also underwent physical therapy for neck and shoulder pain. Records show that she reported a decrease in neck pain. (*See* Tr. at 182.) It was recommended that she continue with physical therapy. (Tr. at 177.) However, plaintiff did not attend her scheduled sessions and, thus, the treatments ended. (*Id.*)

On February 2, 2000, plaintiff saw Dr. Misra again and reported experiencing continuous, intermittent stiffness and pain in her upper back and shoulder blades. (Tr. at 146.) He noted tender spots in her back, arm and shoulder, but no neurological deficits. He diagnosed plaintiff as having fibromyositis and instructed her to continue physical therapy.

Plaintiff saw Dr. Misra again on February 16, 2000, complaining of muscle spasms in her back and pain. Dr. Misra's notes indicate these were relieved by Parafon Forte and that plaintiff had no radiculopathy. (Tr. at 145.)

Plaintiff continued to see Dr. Misra every month. During March, April, May and June, she complained of a cold. (Tr. at 205–07.) Also in June, she complained of neck pain, spasms and stiffness and abdominal burning. (Tr. at 207.) Dr. Misra told plaintiff to take Tylenol and apply heat to her back.

On August 23, 2000, plaintiff had a syncopal episode. (Tr. at 208.) However, she "felt well" during her next visit on August 28 and the treatment record indicates that she reported no back pain. (Tr. at 210.) The record of her September 20 visit appears equally positive. (Tr. at 211.) In October, plaintiff saw twice for tonsillitis, which was resolved. (Tr. at 211–12.) Dr. Misra noted that plaintiff had back pain, but it was "stable." (Tr. at 212.)

On November 1, plaintiff reported increased pain. (Id.) Dr. Misra noted tender points in the shoulder, back and neck and noted that plaintiff had not worked since January. On December 2 and 20, 2000 and January 10, 2001, plaintiff saw Dr. Misra for pelvic cellulitis, which was successfully treated. (Tr. at 213–15.)

Also on January 10, Dr. Misra completed a physical capacity evaluation of plaintiff. (Tr. 199–200.) He stated that she can stand or walk for one hour and sit for one hour during an eight-hour day and lift up to five pounds occasionally. She can use her hands for simple grasping, but not pushing or pulling or fine manipulation. She cannot bend at all, but can occasionally squat, crawl and climb. She is also able to reach above the shoulder level. Dr. Misra stated that plaintiff's disability began September 29, 1999.

Plaintiff saw Dr. Misra again on February 16 and March 28 and complained of a burning feeling in her abdomen and pain in her neck and shoulder. (Tr. at 216.) Dr. Misra noted tender points on the upper back, shoulder, arm and abdominal wall. He prescribed Norgesic Forte, Atenolol and Zantac.

The last treatment record of Dr. Misra's is dated May 25, 2001. Plaintiff reported heartburn, and intermittent back spasms, aching and tightness. (Tr. at 217.) Dr. Misra found no radiculopathy.

After plaintiff applied for Social Security benefits, her records were reviewed by a state-employed medical consultant, Dr. Blaumblatt. On April 13, 2000, he opined that plaintiff could lift and carry fifty pounds occasionally and twenty-five pounds frequently, stand or walk and sit about six hours during an eight-hour day and push or pull an unlimited amount of weight. (Tr. at 190.) He said that she had no postural or manipulative limitations. (Tr. at 191–92.) He rejected the inconsistent treating source statement, stating that it was unsupported by "objective evidence." (Tr. at 195.) It appears that Dr. Baumblatt's evaluation refers to Dr. Misra's undated evaluation, not his January 2001 evaluation, which post-dates Dr. Baumblatt's assessment.

### D. ALJ's Decision

On June 25, 2001, the ALJ issued a decision denying plaintiff's claim at step five of the sequential evaluation process. The ALJ concluded that plaintiff suffered from severe fibromyositis, low-back pain, hiatal hernia, syncope, discogenic back, headache and gastroesophageal reflux disease, but did not have an impairment or combination of impairments listed in or medically equal to those in the Listings. (Tr. at 13.)

The ALJ assessed plaintiff's RFC and determined that she could perform light work, which did not require bending, twisting or squatting and required only occasional climbing and overhead reaching. (Id.) The ALJ rejected plaintiff's subjective complaints of pain as not credible to

the extent they indicated that she could not bend, twist, squat, reach or climb. (*Id.*) The ALJ also rejected Dr. Misra's January 10, 2001 physical capacity evaluation as unsupported by the medical tests and findings.

The ALJ concluded that plaintiff could not return to her previous work. However, based on the testimony of the VE, the ALJ found that there were a significant number of jobs that plaintiff could perform, such as light assembly, hand packaging and cashier jobs. (Tr. at 13–14.)

**E. Magistrate Judge's Review and Plaintiff's Objections**

As noted, the matter was assigned to Magistrate Judge Gorence to issue a recommendation. Judge Gorence concluded that the ALJ's decision was supported by substantial evidence and therefore recommended that it be affirmed. Plaintiff objects to the magistrate's recommendation. She argues that the ALJ (1) improperly rejected Dr. Misra's January 10, 2001 opinion about plaintiff's limitations, (2) failed to contact Dr. Misra before rejecting his opinion, and (3) failed to assess plaintiff's RFC on a function-by-function basis.[5]

**III. APPLICABLE STANDARDS OF REVIEW**

**A. Magistrate's Recommendation**

■ Where a party timely objects to a magistrate's recommendation, I conduct a de novo review of the objected to portions, 28 U.S.C. § 636(b)(1); *see United States v. Raddatz,* 447 U.S. 667, 673–76, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980); and may review de novo any other aspects as I see fit. *See Delgado v. Bowen,* 782 F.2d 79,

81–82 (7th Cir.1986). Because plaintiff has objected, I will conduct a de novo review.

**B. ALJ's Decision**

■ Under 42 U.S.C. § 405(g) a district court may affirm, modify or reverse an ALJ's decision,[6] with or without remanding the case for a rehearing. However, review of the decision is limited, and the ALJ's findings must be upheld if supported by substantial evidence. *Diaz v. Chater,* 55 F.3d 300, 305 (7th Cir.1995). Substantial evidence is such evidence as a reasonable mind would accept as adequate to support a conclusion. *See Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). In determining whether substantial evidence exists, the district court must take into account both evidence in support of a conclusion and anything that fairly detracts from its weight. *Young v. Sec'y of Health & Human Servs.,* 957 F.2d 386, 388–89 (7th Cir.1992). The court must review all the evidence in the record, and such review " 'must be more than an uncritical rubber stamp.' " *Delgado,* 782 F.2d at 82 (quoting *Garfield v. Schweiker,* 732 F.2d 605, 610 (7th Cir.1984)).

■ The ALJ has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and determine the case accordingly. *See Richardson,* 402 U.S. at 399–400, 91 S.Ct. 1420. A reviewing federal court may not decide the facts anew, re-weigh the evidence, or substitute its judgment for that of the ALJ. *Binion on Behalf of Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997). Where conflicting evidence would allow reasonable

---

5. Plaintiff also argues that the ALJ misunderstood fibromyalgia and the Magistrate Judge and Commissioner improperly relied on post-hoc rationalizations. I address these objections in the context of plaintiff's first objection.

6. Because the Appeals Council denied review of plaintiff's case, the ALJ's decision became the final decision of the Commissioner. *Herron v. Shalala,* 19 F.3d 329, 332 (7th Cir. 1994) (citing 20 C.F.R. § 404.981).

minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the ALJ. *Id.*

 However, if the ALJ commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Id.; see also Pugh v. Bowen,* 870 F.2d 1271, 1274 (7th Cir.1989). The ALJ's decision must also demonstrate the path of her reasoning, and the evidence must lead logically to his conclusion. *Rohan v. Chater,* 98 F.3d 966, 971 (7th Cir.1996). "Even if enough evidence exists in the record to support the decision, [the court] cannot uphold it if 'the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.'" *Hodes v. Apfel,* 61 F.Supp.2d 798, 806 (N.D.Ill.1999) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996)). Finally, "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." *Rohan,* 98 F.3d at 970.

## IV. DISCUSSION

### A. Assessment of Treating Source Opinion

In rejecting Dr. Misra's January 10, 2001 opinion, the ALJ stated,

[T]he undersigned can see no reason for the restrictions imposed, based on treatment records. There are no x-rays, MRI studies or CT Scans in the record that show the signs or laboratory findings necessary for a finding of disability as shown at 20 C.F.R. 404.1528(b)(c) [sic].

. . . . .

[T]he objective medical findings ... do not document abnormalities of a magnitude that would be expected to produce disabling pain.... [T]he severe limitations imposed by Dr. Misra ... cannot

be credited due to lack of treatment records and physical findings to support Dr. Misra's assessment.

(Tr. at 12.)

Under the Social Security rulings and regulations, treating source opinions must be given special consideration.

If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the adjudicator must give it controlling weight.

SSR 96–8p, 1996 WL 374184, at *7. If the ALJ finds that the opinion does not warrant controlling weight, the ALJ may not simply reject the opinion. SSR 96–2p, 1996 WL 374188, *4. She still must evaluate the opinion's weight by looking at the length, nature and extent of the plaintiff and physician's treatment relationship, the degree to which the opinion is supported by evidence, the opinion's consistency with the record as a whole, whether the doctor is a specialist, and "other factors." 20 C.F.R. § 404.1527(d). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96–2p, 1996 WL 374188, at *4. Regardless of the weight the ALJ ultimately gives the treating source opinion, the ALJ must "give good reasons" for her decision. 20 C.F.R. § 404.1527(d)(2).

 The ALJ in this case did not supply good reasons for rejecting Dr. Misra's opinion showing plaintiff to be severely limited. First, she rejected the opinion because it was not supported by x-rays, MRI studies, CT scans, laboratory findings or "objective medical findings." However, plaintiff's principal alleged disabling condition was fibromyositis, or fibromyalgia.[7]

---

7. Fibromyaligia and fibromyositis are synony- mous.

X-rays, MRI studies, CT scans and laboratory tests would not reveal the presence or severity of fibromyalgia, the symptoms of which are entirely subjective. *See Sarchet,* 78 F.3d at 307. Those symptoms include " 'pain all over,' fatigue, disturbed sleep, stiffness, and—the only symptom that discriminates between it and other diseases of a rheumatic character—multiple tender spots, more precisely eighteen fixed locations on the body (and the rule of thumb is that the patient must have at least eleven of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch." *Id.* at 306. Given the nature of the condition, the lack of lack of x-rays, MRI studies, CT scans, laboratory findings or objective medical evidence was not probative of whether the record supported Dr. Misra's opinion about plaintiff's limitations. *See also Dominguese v. Massanari,* 172 F.Supp.2d 1087, 1100–01 (E.D.Wis.2001) (holding that the lack of "hard evidence" did not supply a good reason for rejecting a treating source physician's assessment where the disability was fibromyalgia). Thus, the ALJ's explanation did not supply a good reason for rejecting the opinion or according it lesser weight.

The ALJ also rejected Dr. Misra's opinion because of the "lack of treatment records and physical findings." However, the ALJ did not explain what was lacking from the treatment records or physical findings that led her to reject Dr. Misra's opinion. If the ALJ meant that the records lacked x-rays, MRI studies, CT scans or laboratory findings, then this justification is merely a restatement of the first and insufficient for the reasons discussed above. If the ALJ meant that some other proof was lacking, she did not indicate what that was; thus, I cannot determine her basis for rejecting Dr. Misra's opinion, let alone whether that basis supplied a good reason. Dr. Misra's records indicate that plaintiff had pain, stiffness and "tender spots," all

symptoms of fibromyalgia which can be disabling, *see Sarchet,* 78 F.3d at 306–07. The ALJ was, therefore, required to point to particular pieces of evidence in the record indicating that plaintiff's condition was not as severe as Dr. Misra believed. The ALJ failed to do so.

The Commissioner argues in her brief that the treatment records show that "Dr. Misra did not consistently document ... tender spots; ... observed painful trigger points only on occasion[; and] ... described plaintiff's pain as 'intermittent[;]' [and that] plaintiff more frequently reported unrelated medical problems such as gastrointestinal symptoms and nasal congestion." (R. 17 at 3 (internal citations omitted).) This evidence, according to the Commissioner, supports the conclusion that Dr. Misra's opinion was not well-supported. However, even if true, the ALJ cited none of this evidence as reasons for rejecting Dr. Misra's opinion. I cannot supply a ground for the ALJ's decision that is not expressly provided for by the ALJ, even if such ground may exist based on the evidence. *Sarchet,* 78 F.3d at 307; *Scivally v. Sullivan,* 966 F.2d 1070, 1076 n. 5 (7th Cir.1992); *O'Connor v. Sullivan,* 938 F.2d 70, 73 (7th Cir.1991). Thus, the Commissioner's argument is unavailing.

Before Magistrate Judge Gorence, the Commissioner also pointed to the evaluation of Dr. Baumblatt as evidence supporting the ALJ's rejection Dr. Misra's opinion. (R. 10 at 11.) However, the ALJ did not cite Dr. Baumblatt's evaluation either. Thus, it also fails to demonstrate the reasonableness of the ALJ's conclusion.

It may be that the record as a whole supports the conclusion that plaintiff's fibromyalgia was not as disabling as Dr. Misra's opinion described. *See Sarchet,* 78 F.3d at 307 (stating that fibromyalgia is not usually disabling). However, the ALJ failed to point to evidence from the record

to support this conclusion. Thus, I am unable to follow the path of the ALJ's reasoning and the case must be remanded for review of this issue.

### B. Whether the ALJ was Required to Contact Dr. Misra

Plaintiff argues that even if the evidence did not support Dr. Misra's January 10, 2001 opinion, the ALJ was required to contact Dr. Misra before rejecting his opinion. The regulations and rulings require an ALJ to contact a treating physician before rejecting his or her opinion under two circumstances: (1) when the evidence from the treating physician or other medical source is "inadequate for [the Administration] to determine whether [the claimant is] disabled", 20 C.F.R. § 404.1512(e), and (2) when the treating source provides an opinion on an issue reserved to the Commissioner and the basis for the opinion is not clear, SSR 96–5p, 1996 WL 374183, at *6. Neither circumstance applies here.

The record was not inadequate for the ALJ to make a determination. The record contained plaintiff's treatment records over a period spanning four years with no gaps. Thus, the record supplied a sufficient basis for the ALJ to decide whether plaintiff was disabled.

In addition, Dr. Misra did not provide an opinion on an issue reserved to the Commissioner. Issues reserved to the Commissioner include "[w]hether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings; [w]hat an individual's RFC is; [w]hether an individual's RFC prevents him or her from doing past relevant work; [h]ow the vocational factors of age, education, and work experience apply; and [w]hether an individual is 'disabled' under the Act." SSR 96–5p, 1996 WL 374183, at *2. Dr. Misra did not provide an opinion on any of these issues, only

on matters probative of these issues, such as plaintiff's ability to lift, sit, walk, etc., which are not reserved to the Commissioner, *see id.* at *2–5. Thus, the ALJ was not required to contact Dr. Misra before rejecting his opinion.

### C. Assessment of Plaintiff's RFC

The ALJ concluded that plaintiff had the RFC "to perform light work that does not require any bending, twisting or squatting and that requires occasional climbing and occasional overhead reaching." (Tr. at 13.)

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b). Plaintiff argues that the ALJ committed a legal error because she failed to assess plaintiff's ability to perform each of the functions required of light work.

SSR 96–8p, 1996 WL 374184 provides guidance in determining how to assess a claimant's RFC: "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities" and encompasses a claimant's exertional and nonexertional capacities. SSR 96–8p, 1996 WL 374184, at *3.

Exertional capacity addresses an individual's limitations and restrictions of physical strength and defines the individual's remaining abilities to perform each of seven strength demands: Sitting, standing, walking, lifting, carrying,

pushing, and pulling. Each function must be considered separately (e.g., "the individual can walk for 5 out of 8 hours and stand for 6 out of 8 hours"), even if the final RFC assessment will combine activities (e.g., "walk/stand, lift/carry, push/pull").

*Id.* at *5.

The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

*Id.* at *7 (footnote omitted); *see also Myers v. Apfel,* 238 F.3d 617, 620 (5th Cir.2001).

 The ALJ concluded that plaintiff had the RFC to perform light work, with several limitations. However, the ALJ made no findings about plaintiff's ability to lift twenty pounds occasionally and ten pounds frequently and perform a "good deal of walking or standing" or sit "most of the time" while pushing or pulling arm or leg controls. Neither did she describe how the evidence supported the conclusion that plaintiff could perform these functions at all, let alone perform them on a sustained basis eight hours a day, five days a week. Thus, the ALJ's RFC assessment failed to assess plaintiff's ability to perform the functions required for light work.

Magistrate Judge Gorence concluded that this failure was of no consequence because Dr. Baumblatt had assessed plaintiff's ability to perform each function. (R. 15 at 11–12.) However, Dr. Baumblatt's assessment does not satisfy the requirement that the ALJ's decision contain "a narrative discussion describing how the evidence supports each conclusion." *See* SSR 96–8p, 1996 WL 374184, at *7. In addition, as discussed above, the ALJ's decision does not cite Dr. Baumblatt's evaluation; thus, I cannot presume that it supplied a basis for the ALJ's conclusion that plaintiff could perform each of the functions that light work requires.

In addition, the ALJ's apparent conclusion that plaintiff could perform each of the functions required of light work is inconsistent with other evidence in the record. In September 1997, Dr. Misra permanently limited plaintiff to lifting no more than five pounds occasionally, (Tr. at 143), significantly less than the occasional twenty-pound and frequent ten-pound lifting required for light work. The ALJ's decision makes no mention of this opinion. Thus, the decision fails to "explain how [a] material inconsistenc[y was] ... considered and resolved." *See* SSR 96–8p, 1996 WL 374184, at *7. This failure is of particular significance because Dr. Misra was plaintiff's treating physician; therefore, his opinion was presumptively entitled to significant weight. *See* SSR 96–2p, 1996 WL 374188, at *2–5.

For the foregoing reasons, the case must be remanded for a consideration of plaintiff's ability to perform each function required of light work on a regular and continuing basis. *See Gotz v. Barnhart,* 207 F.Supp.2d 886, 897 (E.D.Wis.2002) (reversing and remanding where the ALJ failed to engage in a function-by-function assessment in determining plaintiff's exertional category).

## V. CONCLUSION

For the foregoing reasons I decline to follow the recommendation of the magistrate judge; and

**IT IS HEREBY ORDERED** that the decision of the Administrative Law Judge is **REVERSED** and **REMANDED** to the Social Security Administration for action consistent with this opinion.