**Anthony J. WORZALLA, Plaintiff,**

v.

**Jo Anne BARNHART, Commissioner of the Social Security Administration, Defendant.**

**No. 01–C–1083.**

United States District Court, E.D. Wisconsin.

March 27, 2004.

Marcie A. Goldbloom, for Plaintiff or Petitioner.

Nora S. Barry, for Defendant or Respondent.

## DECISION AND ORDER

ADELMAN, District Judge.

Plaintiff Anthony Worzalla brings this action under 42 U.S.C. § 405(g) seeking judicial review of the decision of defendant

Jo Anne Barnhart, Commissioner of the Social Security Administration, denying his 1993 application for disability benefits. Because the Commissioner's decision is infected with legal error and unsupported by substantial evidence, I reverse. Because the application has been pending for 11 years .and been remanded three times previously, I will order that the application be granted rather than sending it back for further proceedings. *See Wilder v. Apfel,* 153 F.3d 799, 801 (7th Cir.1998).

## I. PROCEDURAL HISTORY

Plaintiff initially applied for benefits on August 12, 1993, alleging that he had been unable to work since August 7, 1993 due to a back disorder, heart condition, diabetes, hand pain, and a history of anxiety and depression. (Tr. at 15; 70.)[1] His application was denied initially and on reconsideration. (Tr. at 74; 80.) He requested a hearing before an Administrative Law Judge (ALJ) (Tr. at 85), and on September 18, 1995 appeared before ALJ Bernoski. (Tr. at 30.) However, on November 3, 1995, the ALJ issued a decision denying his claim. (Tr. at 15–21.) After the Appeals Council denied his request for review, plaintiff sought judicial review in this court, and on November 15, 1997, Magistrate Judge Goodstein granted the Commissioner's unopposed motion to remand pursuant to 42 U.S.C. § 405(g), sentence four. In the motion, the Commissioner stated that the ALJ "misinterpreted comments made by Sandra King, Ph.D. in concluding that claimant did not have a significant mental impairment." (Tr. at 570–71.) Judge Goodstein's remand order provided:

> Upon remand, this case will be assigned to an Administrative Law Judge to further consider the report of Dr. Sandra King. The Administrative Law Judge

will update the record, obtain a psychological consultative examination and receive supplemental vocational expert testimony to better assess the claimant's residual functional capacity and determine whether there are jobs he can do. (Tr. at 568–69.) On February 18, 1998, the Appeals Council, in response to Judge Goodstein's order, remanded the case to the ALJ with additional instructions. (Tr. at 573–74.)

While the appeal of plaintiff's August 12, 1993 application was pending, he submitted a new application for benefits dated September 27, 1996. (Tr. at 604.) Upon review of the new application, the Administration concluded in December 1996 that plaintiff suffered from a presumptively disabling (i.e."listed") impairment—ischemic heart disease—and awarded him benefits. The Administration determined that plaintiff was disabled due to this impairment as of September 1, 1995. However, in order to avoid conflict with the ALJ's November 3, 1995 decision, it set the onset date as of November 4, 1995. (Tr. at 324–25; 580; 589; 640.)

Pursuant to the remand order, ALJ Bernoski held another hearing on the first application on April 19, 1999. (Tr. at 339.) Prior to the hearing, the ALJ obtained updated records and a psychological consultative examination. (Tr. at 325; 414.) At the hearing, plaintiff amended his application to seek a "closed period" of benefits from August 7, 1993 to November 3, 1995 based on the acceptance of his subsequent application, and additional testimony was taken. (Tr. at 341–72.) However, rather than complying with the remand order and resolving the "closed period" issue, on August 27, 1999, the ALJ dismissed the 1993 application as "moot" based on the favorable determination on the 1996 application.

---

1. In this decision, I will cite the administrative transcript as "Tr. at ___." I will cite documents filed in this court as "R. ___ at ___."

(Tr. at 590.) Plaintiff sought review by the Appeals Council, and on February 23, 2000 the Council vacated the ALJ's decision, stating that "the Administrative Law Judge needs to comply with the remand order dated February 18, 1998 and render a decision on the issue of disability, for the period August 7, 1993 to November 3, 1995, raised by the claimant's application dated August 12, 1993. Upon remand, the Administrative Law Judge will comply with the court's order." (Tr. at 595.)

On September 14, 2000, a third hearing was held, this one before ALJ Bartelt. In a decision dated December 28, 2000, ALJ Bartelt also denied plaintiff's claim. He found that during the period of August 7, 1993 through November 3, 1995, plaintiff was able to perform unskilled, simple, light and sedentary work. He rejected Dr. King's report and concluded that plaintiff's mental impairment was non-severe. (Tr. at 332.) Thus, he denied the "closed period" claim.

Plaintiff asked the Appeals Council to review the decision, but it declined to do so. Plaintiff then filed another § 405(g) action in this court. Remarkably, the matter was remanded yet again on February 2, 2002, this time under sentence six of § 405(g) so the Administration could search for missing records.[2] (R. 10.) The case was reinstated to the court's docket on July 2, 2002. (R. 14.)

On January 30, 2004, the magistrate judge to whom the case had been assigned for pre-trial proceedings issued a recommendation that plaintiff's appeal be denied and the ALJ's decision be affirmed.[3] (R. 32.) Plaintiff filed timely objections. (R.

33.) The Commissioner responded in defense of the recommendation, and plaintiff replied. The matter is now before me for decision.

## II. APPLICABLE LEGAL STANDARDS

### A. Disability Standard

In order to obtain benefits under the Social Security Act, plaintiff must be disabled, that is, he must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). He must show that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Social Security Administration has adopted a sequential five-step test for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520; 416.920. Under this test, the Commissioner must determine: (1) whether the claimant is presently unemployed; (2) if so, whether the claimant has a severe impairment or combination of impairments;[4] (3) if so, whether any of the claimant's impairments are listed by the Administration as being so severe as to preclude substantial gainful activity ("SGA");[5] (4) if not, whether the

---

**2.** Apparently, the Commissioner could not find the file or the hearing tape. (R. 10 at 2.)

**3.** The parties had not consented to jurisdiction by the magistrate judge, so she could only make a recommendation on plaintiff's appeal. *See* 28 U.S.C. § 636(b).

**4.** An impairment is severe if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

**5.** These impairments are listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e. "the Listings").

claimant possesses the residual functional capacity ("RFC") to perform his past work; and (5) if not, whether the claimant is able to perform any other work in the national economy in light of his age, education and work experience. *E.g., Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir.2000); *Rucker v. Chater,* 92 F.3d 492, 494 (7th Cir.1996).

The claimant will automatically be found disabled if he makes the requisite showing at steps one through three.[6] *See Henderson ex rel. Henderson v. Apfel,* 179 F.3d 507, 512 n. 3 (7th Cir.1999). If the claimant is unable to satisfy step three, he must then demonstrate that he lacks the RFC to perform his past work. *Id.* If he makes this showing, the burden shifts to the Commissioner to establish that the claimant can engage in some other type of substantial gainful employment. *Id.* The Commissioner may carry this burden either by relying on the testimony of a vocational expert ("VE"), who evaluates the claimant's ability to perform work in the national economy in light of his limitations, or through the use of the "Medical–Vocational Guidelines," (a.k.a. "the Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2. *See Heckler v. Campbell,* 461 U.S. 458, 461, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). The Grid is a chart that classifies a person as disabled or not disabled based on his exertional ability, age, education and work experience. *See Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir.1987); *see also Heckler,* 461 U.S. at 461–62, 103 S.Ct. 1952; *Caldarulo v. Bowen,* 857 F.2d 410, 413 (7th Cir.1988). The Commissioner may not rely on the Grid if the person's attributes do not correspond precisely to a particular rule, *see Caldarulo,* 857 F.2d at 413, or if non-exertional limitations (e.g., pain, or mental, sensory or skin impairments)

might substantially reduce the claimant's range of work, *see Zurawski v. Halter,* 245 F.3d 881, 889 (7th Cir.2001) (citing *Luna v. Shalala,* 22 F.3d 687, 691 (7th Cir.1994)). In such a case, the Commissioner must solicit the testimony of a VE, *Herron v. Shalala,* 19 F.3d 329, 337 (7th Cir.1994), although she may use the Grid as a "framework" for making a decision, *see* 20 C.F.R. § 404, Subpt. P, App. 2, § 200.00(e)(2).

As noted, plaintiff is currently receiving benefits based on a determination that he has been disabled due to a listed impairment since November 4, 1995. In dispute is whether plaintiff is entitled to a "closed period" of disability benefits from August 7, 1993 through November 3, 1995. Ordinarily, the issue in a closed period case is whether the claimant has experienced sufficient "medical improvement" to justify terminating benefits previously approved. *See, e.g., Waters v. Barnhart,* 276 F.3d 716, 719–20 (5th Cir.2002). In the present case, however, the issue for the ALJ was simply whether the evidence was such that plaintiff could be found disabled during the operative period. This essentially required to the ALJ to determine "retrospectively" whether plaintiff's condition in 1993–1995 was such that benefits should be awarded. *See Wilder v. Chater,* 64 F.3d 335, 337 (7th Cir.1995); *see also Wilder,* 153 F.3d at 802; *Estok v. Apfel,* 152 F.3d 636, 640 (7th Cir.1998).

**B. Standard of Review of Magistrate Judge's Recommendation**

■ Where a party timely objects to a magistrate judge's recommendation, I conduct a de novo review of the objected-to portions, 28 U.S.C. § 636(b)(1); *see United States v. Raddatz,* 447 U.S. 667, 673–76, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980); and

---

**6.** In accepting his September 1996 application, the Administration concluded that plain-

tiff had done just that.

may review de novo any other aspects as I see fit, *see Delgado v. Bowen,* 782 F.2d 79, 81–82 (7th Cir.1986). Based on plaintiff's objection, I will conduct a de novo review of the recommendation.

## C. Standard of Review of ALJ's Decision

 Under § 405(g), a district court may affirm, modify or reverse an ALJ's decision, with or without remanding the case for a rehearing. However, the court's review of the ALJ's the decision is limited, and the ALJ's factual findings must be upheld if supported by substantial evidence. 42 U.S.C. § 405(g); *Diaz v. Chater,* 55 F.3d 300, 305 (7th Cir.1995). Substantial evidence is such evidence as a reasonable person would accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Cannon v. Apfel,* 213 F.3d 970, 974 (7th Cir.2000). In determining whether substantial evidence exists, the district court must take into account both evidence in support of a conclusion and anything that fairly detracts from its weight. *Young v. Sec'y of Health & Human Servs.,* 957 F.2d 386, 388–89 (7th Cir.1992). The court must review all the evidence in the record, and such review "must be more than an uncritical rubber stamp." *Garfield v. Schweiker,* 732 F.2d 605, 610 (7th Cir.1984).

 Nevertheless, it is the ALJ who has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact and determine the case accordingly. *See Richardson,* 402 U.S. at 399–400, 91 S.Ct. 1420. A reviewing federal court may not decide the facts anew, reweigh the evidence or substitute its judgment for that of the ALJ. *Powers v. Apfel,* 207 F.3d 431, 434 (7th Cir.2000); *Binion on Behalf of Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997). Where conflicting

evidence would allow reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the ALJ. *Binion,* 108 F.3d at 782.

 If the ALJ commits an error of law, however, reversal is required without regard to the volume of evidence in support of the factual findings. *Id.; see also Pugh v. Bowen,* 870 F.2d 1271, 1274 (7th Cir.1989). The ALJ commits such an error if he fails to comply with the Commissioner's regulations and rulings. *See Prince v. Sullivan,* 933 F.2d 598, 602 (7th Cir.1991).

 The ALJ's decision must also demonstrate the path of his reasoning, and the evidence must lead logically to his conclusion. *Rohan v. Chater,* 98 F.3d 966, 971 (7th Cir.1996). While the ALJ need not discuss every piece of evidence in the record, he must provide at least a glimpse into his reasoning. *Zurawski,* 245 F.3d at 889. "Even if enough evidence exists in the record to support the decision, [the court] cannot uphold it if 'the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.'" *Hodes v. Apfel,* 61 F.Supp.2d 798, 806 (N.D.Ill.1999) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (1996)).

 Finally, ALJs "must not succumb to the temptation to play doctor and make their own independent medical findings." *Rohan,* 98 F.3d at 970. "The medical expertise of the Social Security Administration is reflected in regulations; it is not the birthright of the lawyers who apply them." *Schmidt v. Sullivan,* 914 F.2d 117, 118 (7th Cir.1990).

## III. DISCUSSION

Plaintiff raises two claims of error by the ALJ,[7] but one is dispositive. The pri-

---

7. Plaintiff argues that the ALJ (1) failed to properly evaluate the opinion of Dr. Chen and

mary reason that this case was remanded in the first place was so the ALJ could obtain additional information and re-consider his decision concerning plaintiff's mental impairment. ALJ Bernoski did obtain a consultative examination, and both he and ALJ Bartelt took additional testimony. However, ALJ Bartelt's decision on this issue is logically flawed, infected with legal error, and not supported by substantial evidence.

## A. Evidence of Plaintiff's Mental Impairment

The ALJ stated that the evidence pertaining to plaintiff's mental status was lacking during the relevant time period, except for the report of Dr. Sandra King. (Tr. at 327.) Dr. King's report is a good place to start.

### 1. Dr. King

Dr. King evaluated plaintiff on April 10, 1995. (Tr. at 285.) Plaintiff first described his many physical problems—Forester's disease, which he described as a rare form of arthritis affecting his spine; severe headaches; diabetes; fibromyalgia; arthritis of the knees, wrists, hands and shoulder; intestinal inflammation; diverticulitis; and kidney stones. He also mentioned that he had two discs surgically removed from his back, as well as previous carpal tunnel surgery on his left hand. (Tr. at 285.)

Plaintiff indicated that he graduated high school in 1963, after which he served in the Marine Corps in Vietnam. Following discharge from the service, he mainly worked as a truck driver. He stated that he worked until August 1993, when he quit due to health problems. (Tr. at 285.)

Dr. King's clinical interview revealed post-traumatic stress symptoms, probably as a combined result of plaintiff's military experience in Vietnam and childhood physical abuse from his father. "He appears to have difficulty with concentration and some difficulty in staying on tasks, as observed during the testing." (Tr. at 285.)

Dr. King verbally administered the Wechsler Adult Intelligence Scale–Revised (WAIS–R), the Reading and Spelling sections of the Wide Range Achievement Test–3 (WRAT–3), and the Minnesota Multi-phasic Personality Inventory–2 (MMPI–2). She stated that the tests were not given in written form to avoid overuse of plaintiff's hands. (Tr. at 286.)

The results of the WAIS–R test revealed average intelligence, but deficits were noted in the sub-tests measuring immediate memory for digits and in calculatory skills, "suggesting the likelihood of the presence of anxiety and/or tension of clinically significant magnitude." Plaintiff's WRAT–3 scores indicated low average reading and spelling skills. (Tr. at 286.)

On the Beck Depression Inventory (BDI), his obtained score was well within the range suggesting the presence of severe depression and suicidal ideation. He endorsed such statements as "I am sad all the time and I can't snap out of it; I feel that the future is hopeless and that things cannot improve; I would kill myself if I had the chance; I used to be able to cry, but now can't even though I want to; I have lost most of my interest in other people; I have greater difficulty in making decisions than before; I wake up several hours earlier than I used to and cannot get back to sleep; My appetite is not as good as it used to be; and I am very worried about physical prob-

---

the limitations on plaintiff's use of his hands, and (2) erred in his evaluation of plaintiff's mental impairment. In his objections to the magistrate's recommendation, he also argues that the ALJ failed to consider the VA's finding that plaintiff was disabled.

lems and it's hard to think of much else."

His obtained profile on the MMPI–2 is suggestive of a poor tolerance for stress and pressure, a poor self-concept, and self-dissatisfaction in a personality with deteriorated defenses. A prominent concern about physical integrity and the presence of a large number of somatic complaints is suggested. Similar patients are severely depressed, worrying and pessimistic. Indecision and social withdrawal may be characteristic as well as anorexia and sleep disturbance. Feelings of inadequacy and self-depreciation may reach a delusional quality. Scale elevations suggest that physical symptoms may be chronic and adhered to with great rigidity. A disabling level of pathology appears to be present, with the suggestion of agitated rumination, fearfulness and the likelihood of fixed obsessions, compulsions, or phobias. Severe levels of tension and anxiety make even simple routine tasks impossible. The clear use of intellectualization, isolation and rationalization presents no relief, constant rehashing of problems and their possible solutions leads only to the continuation of present misery. Socially introverted, shy and socially inept individuals often have similar scale elevations, tending to be withdrawn, aloof and anxious in their social interactions. Clinical interview and testing results suggest a diagnosis of 293.89 Anxiety Disorder due to Multiple Physical Complaints, along with 300.4 Dysthymic Disorder, with Melancholic Features. The prognosis for improvement is very poor. (Tr. at 286–87.)

Dr. King's summary and recommendations were:

At this time, Mr. Worzalla is displaying severe psychological symptoms of anxiety and chronic depression, including suicidal ideation, along with his multiple physical diagnoses/complaints. He has been treated for several physical problems, and is currently undergoing medical care for arthritis and possible diabetes. Mr. Worzalla appears to be entirely overwhelmed by his many difficulties, and at this point continually ruminates over his problems. His concentration skills and decision-making abilities have been severely compromised by this excessive anxiety and depression. It does not appear that he would be able to work in any capacity at this time due to his disabling level of anxiety, in that the possibility of making mistakes which could result in severe harm to himself or others is greatly increased. His depressive symptoms are very severe, with suicidal ideation. A psychiatric evaluation to assess for possible psychotropic medication and subsequent counseling/therapy, especially to address his suicidal thinking, is strongly recommended at this time. It should be noted, however, that Mr. Worzalla's difficulties are a combination of chronic physical and psychological complaints which render him unable to become involved in a competitive work situation, and that there is a possibility of some relief of some of the difficulties, but little likelihood that enough of his difficulties would be resolved, resulting in fitness for employability.

(Tr. at 287.)

In his decision, the ALJ summarized Dr. King's report. (Tr. at 327–28.) He then complained that Dr. King had not provided plaintiff's specific scores on the tests, and noted that "there is absolutely no follow-up with regard to treatment or evaluation, nor any indication of actual suicide attempts." (Tr. at 328.) He stated: "The diagnoses were anxiety disorder due to multiple physical complaints and dysthymic disorder with melancholic features. Neither of

those diagnoses would suggest the severe clinical depression and concerns with regard to suicide [sic] ideation which Ms. King had suggested in her report." (Tr. at 328.)

### 2. Dr. Roets

The ALJ also admitted the psychological consultative exam obtained following the first remand. Plaintiff saw Cheryl Roets, Ph.D. at the behest of Administration on October 5, 1998. (Tr. at 414.) Plaintiff described his various physical ailments and indicated that he had been diagnosed with depression, anxiety and post-traumatic stress disorder. (Tr. at 414.) "He described himself as blacking out fairly frequently as well." (Tr. at 414.) Plaintiff stated that he was under the care of a cardiologist—Dr. Wolf, a psychiatrist—Dr. White, and previously a psychologist—Dr. Gillespie. (Tr. at 414.)

Plaintiff described himself as "being prone to rages, particularly in the past." (Tr. at 416.) He stated that he lost his temper very easily and described his ability to interact with co-workers as "fair, at best." (Tr. at 416.) He stated that he easily became frustrated with others and worried at times he would kill someone. (Tr. at 416.)

Dr. Roets described plaintiff as "anxious but cooperative throughout his interview." (Tr. at 416.) However, he frequently gave tangential responses, particularly concerning his childhood and resentment towards his father. In regard to thought content, plaintiff indicated that while he did not have visual hallucinations he did occasionally hear a humming noise. (Tr. at 416.) He described himself as suffering from memory loss and having difficulty concentrating. (Tr. at 416.) Although he denied frequent crying, he stated that he lashed out in anger fairly often. He acknowledged one suicide attempt as a teenager consisting of drinking an entire bottle of alcohol. "He also identified some current passive suicidal ideation." (Tr. at 417.)

Dr. Roets then administered various verbal tests, which revealed "some memory impairment as well as difficulty with concentration" (Tr. at 417); "an average ability to engage in abstract thinking" (Tr. at 417); "a below average ability to find similarities" (Tr. at 418); and "that his judgment may not be well developed" (Tr. at 418).

Dr. Roets also administered the MMPI. However, she concluded that the test profile may have been invalid, "likely due to his attempt to exaggerate his symptoms." (Tr. at 418.) "Some suggestion of a thought disorder is present as well as symptoms of posttraumatic stress disorder. Unfortunately, little more can be extrapolated given the extreme direction of his profile." (Tr. at 418.)

Dr. Roets summarized:

> The claimant is [a] 53 year old, Caucasian, married male. He is a Vietnam veteran and high school graduate. Mr. Worzalla grew up in a reportedly violent and chaotic household from which he suffers many residual effects. In addition, he has numerous medical conditions which have left him in a rather fragile state. It is very unlikely that this individual could sustain the rigors of full-time employment given the combination of his psychological and medical concerns. He likely suffers from depression as well as symptoms of posttraumatic stress disorder. He seems to be affected by anxiety from time to time as well. He appears to be able to handle his own finances, although it is very unlikely that he would be able to live on his own without much assistance from others.

(Tr. at 418.)

Dr. Roets's diagnoses were:

| Axis I: | 296.24 | Major depression with psychotic features. |
| | 309.81 | Posttraumatic stress disorder, chronic. |
| Axis II: | 301.9 | Mixed personality disorder. |
| ... | | |
| Axis V: | GAF = 50. | |

(Tr. at 419.)

In an attached assessment form, Dr. Roets indicated that plaintiff's ability to relate to co-workers, deal with the public, interact with supervisors, deal with work stresses, and function independently was "poor"; his ability to follow work rules, use judgment, and maintain attention/concentration was "fair." (Tr. at 420.) She wrote that plaintiff "has a history of difficulty interacting appropriately with co-workers and supervisors. He appears to have difficulty seeing others' points of view. He feels persecuted by others. PTSD symptoms make it difficult for him to judge others' actions objectively." (Tr. at 421.) She rated his ability to understand, remember and carry out complex job instructions as "poor or none"; his ability to understand, remember and carry out detailed but not complex instructions as "fair"; and his ability to carry out simple work instructions as "good." (Tr. at 421.) She rated his ability to behave in an emotionally stable manner and demonstrate reliability as "fair," and his ability to relate predictably in social settings as "poor." (Tr. at 421.) She wrote: "This individual's concern with his many medical problems makes him a poor candidate for full time employment. His emotional state is fragile, and its likely absenteeism would be a problem." (Tr. at 422.)

> The ALJ seemed to prefer Dr. Roets's opinion to that of Dr. King, stating: In contrast to Ms. King's report in which she proceeded to interpret the test score making no reference whatsoever to concerns regarding test validity, Ms. Roets in her report did provide the test scores and profile, noting an extreme elevation on the F scale as it relates to validity, specifically stating that she believed the

test profile to be invalid and likely a reflection of claimant's attempt to exaggerate his symptoms."

(Tr. at 328.) However, the ALJ went on to note:

> Despite specifically stating that claimant's MMPI scores were invalid, Ms. Roets did nevertheless offer the diagnosis of major depressive disorder with psychotic features, basing that in large part on claimant's exaggerated responses to a number of questions asked, also offering diagnoses of chronic posttraumatic stress disorder in conjunction with plaintiff's claims of previous abuse by his father when he was younger and claims by claimant of having a difficult time coping with things in Vietnam while he was stationed there. An Axis II diagnosis of mixed personality disorder was also offered in conjunction with claimant's claims of having severe problems controlling his anger. Global Assessment of Functioning was estimated at 50.

(Tr. at 328.)

### 3. Dr. Gillespie

The ALJ also reviewed the medical records of Dr. Gillespie, which post-dated the closed period. Plaintiff saw Dr. Gillespie for a psychological consultation on November 21, 1996 on referral from a pain clinic. Plaintiff presented with "multiple complaints of chronic pain and physical disfunction." (Tr. at 467.) Dr. Gillespie summarized plaintiff's medical history, then noted:

> [T]he patient is a Vietnam Veteran who has suffered from post-traumatic stress symptoms since returning from Vietnam and also was exposed to Agent Orange and was awarded compensation based on this exposure.... In connection with [his] multiple medical problems, physical disabilities and chronic pain, the patient

does appear to suffer from emotional distress, which is related both to his history of post-traumatic stress but is also clearly related to his adjustment to his physical and medical problems and the social and economic aspects of these problems as well. It is of note that the culmination of all these problems has resulted in this patient being unable to work since 1993.

(Tr. at 467.)

Dr. Gillespie noted that plaintiff had no communication deficits and at least average intelligence. However, he "did indicate and exhibit some deficits with respect to attention and concentration." Plaintiff's capacity for abstraction was within normal limits, he showed good task persistence, and his executive functioning was within normal limits. He was able to process information, follow instructions and solve problems. (Tr. at 469.) Memory, reasoning skills, and social and safety judgment were within normal limits. (Tr. at 469–70.)

Dr. Gillespie then noted:

This patient's emotional functioning is impaired. He exhibits general signs of emotional distress that are moderate to severe in nature. While he appears to have adequate resources to cope normally, at this time, he seems somewhat overwhelmed by the multiple problems that he is confronted with. The patient's coping style is an ideational and introversive one. He is also a somewhat obsessive and ruminative person. The patient did exhibit moderately severe symptoms of depression including dysphoria, helplessness, despondency, pessimism and anhedonia. There was also evidence of sleep disturbance, decreased libido and decreased energy levels. There was no indication of any suicidal ideation, and there is no history of such ideation or gestures. There was no evidence of mania or severe anxiety. The patient did, however, exhibit some symptoms of pre-occupation with his problems. He seemed worried and, at times, fearful concerning his conditions. There was no evidence of agitation. There was indication of impaired frustration tolerance but no history or evidence of assaultive or homicidal ideation. The patient did indicate that he was, at times, irritable, especially when he was experiencing significant degrees of pain. Affect tended to be negative, withdrawn and somewhat blunted but was consistent with his depressed mood.

The patient's social functioning appears quite restricted secondary to his physical problems and pain. He did appear to have an adequate repertoire of social skills. He maintains positive relationships with his family, although he does appear to have few friends and very few advocational activities at this time. General daily functioning is restricted somewhat dependent on others because of his physical problems.

(Tr. at 470.)

Dr. Gillespie also noted: "There is some evidence that the patient may tend towards somatization when under stress and may be overly symptom focused at present. It is unclear whether he is exaggerating his symptomatology, but this is a possibility and may reflect a plea for help on his part." (Tr. at 471.)

Dr. Gillespie concluded:

It is my impression that Mr. Worzalla is an individual who is experiencing multiple physical problems and chronic pain, which are adversely effecting his emotional and psychological functions. These problems also occur in the context of a long history of other factors which may [a]ffect his psychological condition. This includes a history of post-traumatic stress secondary to military service in Vietnam and exposure to Agent Orange, which also occurred during his Vietnam

experience. The patient has also had a long history of vocational difficulties secondary to his physical problems and is now adversely [a]ffected economically by this. All of this increases feelings of depression and pessimism on his part and decreases his capacity to cope on a day to day basis. It is my impression that, if the patient's chronic pain is reduced, his psychological functioning will improve. However, it is unlikely that his functioning in all areas will improve completely despite removal of his pain. Much of this patient's problem does appear to be related to multiple underlying physical problems.

(Tr. at 471.) [8]

The ALJ summarized Dr. Gillespie's consultation notes, then stated that Gillespie "speculated that claimant was suffering from multiple physical problems and chronic pain which adversely affected his emotional and psychological functioning." (Tr. at 329.)

As the ALJ noted, plaintiff saw Dr. Gillespie for out-patient therapy on January 9, 1997. (Tr. at 329.) Plaintiff told Dr. Gillespie that he had seen Dr. White for an evaluation, and that Dr. White had continued his psychotropic medications but suggested an increase in sertraline.[9] Plaintiff reported that he was "much less depressed and anxious" and was "using the stress management techniques" Dr. Gillespie had shown him. (Tr. at 478.) Dr. Gillespie's "impression continue[d] to be that the pa-

tient is experiencing an adjustment disorder secondary to multiple physical problems and chronic pain." (Tr. at 478.)

### 4. Dr. White

Finally, the ALJ reviewed the notes provided by Dr. White. (Tr. at 329.) Although the records are handwritten and difficult to read, it appears that plaintiff began seeing Dr. White in early 1997. (Tr. at 494.) In a February 3, 1997 note, Dr. White noted that plaintiff had been taking sertraline and Amitriptyline.[10] (Tr. at 494.) Dr. White continued these medications and noted that plaintiff was "doing very well" by May 1997. (Tr. at 494.) Dr. White continued to prescribe Zoloft through April 1998, when the records end. The April 17, 1998 notes indicates that plaintiff was "mentally better" but remained "seriously depressed." (Tr. at 498.) [11]

### B. ALJ's Conclusion as to Plaintiff's Mental Impairment

Upon review of this evidence, the ALJ concluded:

As to claimant's mental status, the most accurate diagnosis for the period in question is probably dysthymia/adjustment disorder. There were at most mild limitations in social functioning and concentration, persistence or pace with no episodes of decompensation and no limitations with regard to activities of daily living. As to the claimant's asser-

---

**8.** In a pain questionnaire completed the same day, plaintiff indicated that the effects of his pain made him "[s]everely upset, quite depressed, bitter, desparate, withdrawn." (Tr. at 476.)

**9.** Sertraline is the generic name for Zoloft, a medication used to treat depression and PTSD. *Physician's Desk Reference* 2691 (2004). (*See also* Tr. at 617.)

**10.** Amitriptyline is used to treat depression and chronic pain. (Tr. at 624.)

**11.** Although they were unmentioned by the ALJ, records from the VA also revealed that plaintiff continued to take Zoloft for his depression, along with a host of other medications, in 1997 and 1998. (Tr. at 486–92.) Earlier VA records disclose that plaintiff was taking Amitriptyline as early as November 1993, but it appears that this was for fibromyalgia. (Tr. at 219.) Records from early 1994 confirm that he was still taking Amitriptyline at that time. (Tr. at 244, 246.)

tions of post-traumatic stress disorder, there has been absolutely no mention of such in any of the earlier records, claimant having clearly demonstrated the capacity for functioning long after his service in Vietnam and even the more recent records offer little if any emphasis on such, focus being more on presumed traumatic events occurring when claimant was younger and subject to the alleged abuses by his father and mother. There is no question that strong secondary gain considerations exist and that there are tendencies on claimant's part to exaggerate his complaints, his responses to the Minnesota Multiphasic Personality Inventory clearly underscoring such. As to the report by Sandra King, Ph.D. in April of 1994 [sic [12]], it was commissioned by claimant's representative and no doubt intended to further supplement claimant's disability claim by adding yet another impairment to the host of complaints which were already being alleged. The fact that Ms. King did not even express concerns with regard to the clear elements of exaggeration on the MMPI, and given claimant's lack of follow-up with regard to alleged suicide [sic] ideation the undersigned believes that was claimant exaggerating symptoms and Ms. King was hardly being objective, more or less accepting claimant's assertions at face value and offering not even the slightest amount of skepticism as to the truthfulness of claimant's claims. The under signed gives her report limited weight as there is little evidence of any treatment for a mental impairment either before that report or in the months and years after such, the first notation not being until 1997. Even those records between 1997 and 1998

are hardly impressive in terms of findings of mental status examination results. Accordingly, absent additional evidence to suggest otherwise the undersigned finds that for the period August 7, 1993 through November 3, 1995 claimant retained the capacity for simple, routine, unskilled types of sedentary and light jobs provided that there is no forceful repetitive use of the hands nor any frequent ongoing overhead reaching involving the shoulders.... Testimony by the vocational expert more than adequately meets the Commissioner's burden of demonstrating that while claimant may be precluded from his past jobs there remained a significant number of jobs in the economy which he was still capable of performing.

(Tr. at 331–32.) [13]

## C. The ALJ's Conclusion was Flawed

The ALJ reached this conclusion contrary to law and without a sufficient basis in the record. There are two primary problems with his decision.

### 1. The ALJ Cited No Medical Evidence in Support of his Conclusion

■ Most fundamentally, the ALJ cited no medical evidence in support of his finding, deciding for himself "the most accurate diagnosis." As the Seventh Circuit has noted, depression "is a mental illness; and health professionals, in particular psychiatrists, not lawyers and judges are the experts on it. The question what stage a physical or mental illness had probably reached some years before it was first diagnosed is a medical question[.]" *Wilder*, 64 F.3d at 337. By making his own diagnosis and setting his own restrictions,

---

**12.** Dr. King's report was from April 1995.

**13.** In this numbered findings, the ALJ stated that plaintiff suffered from "mild, nonsevere affective disorder." (Tr. at 332 # 3.)

the ALJ impermissibly "played doctor." *See Rohan*, 98 F.3d at 970 (stating that ALJs "must not succumb to the temptation to play doctor and make their own independent medical findings").

The medical evidence in this case supported plaintiff's claim of a severe mental impairment. The ALJ was not allowed to reject it without relying on other evidence or authority in the record. *See, e.g., Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 540 (7th Cir.2003). Not only did he fail to do so, making his own medical determination, his evaluation of the medical evidence that was in the record was deficient.

### 2. The ALJ Failed to Properly Evaluate the Medical Evidence

#### a. Dr. King

The ALJ rejected Dr. King's report, created during the operative time period, for reasons that cannot withstand scrutiny. The ALJ first complained that Dr. King did not provide the scores for the tests she administered. (Tr. at 328.) But what was the ALJ to do with the scores? Provision of the figures is worth little absent the ability to properly evaluate them. That is why courts have regularly warned ALJs not to attempt to interpret test results or other raw medical data. *See, e.g., Manso–Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 17 (1st Cir.1996) (stating that "an ALJ, as a lay person, is not qualified to interpret raw data in a medical record"); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir.1985) ("By independently reviewing and interpreting the laboratory reports, the ALJ impermissibly substituted his own judgment for that of a physician; an ALJ is not free to set his own expertise against that of a physician who presents competent evidence."); *Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir.1982) ("Because an Administrative Law Judge as a rule is not a doctor, he should avoid commenting on the meaning of a test or clinical x-ray when there has been no supporting expert testimony."); *Grindle v. Sullivan*, 774 F.Supp. 1501, 1513 (N.D.Ill.1991) (stating that ALJ "was not in a position to interpret the results of the Doppler test on his own").

Second, the ALJ noted that there was "absolutely no follow-up with regard to treatment or evaluation, nor any indication of actual suicide attempts or severe depression necessitating hospitalization, much less outpatient therapy." (Tr. at 328.) The ALJ was wrong that plaintiff received no treatment for depression after Dr. King's evaluation. He saw Dr. Gillespie and was prescribed Zoloft and Amitriptyline by Dr. White. He also received medication from the VA. Further, there is no requirement in social security law that a claimant require hospitalization in order to demonstrate a severe mental impairment. *See Wallace v. Barnhart*, 256 F.Supp.2d 1360, 1371 (S.D.Fla.2003) (rejecting ALJ's finding, based on lack of hospitalization, that plaintiff's depression and anxiety were not severe, and noting that while hospitalization may add to the strength of a disability claim, it is not an essential element in establishing a severe impairment). Nor must a claimant try to kill himself to prove that he really is depressed. Dr. King used the words "suicidal ideation," which means the "formulation of thoughts or ideas" [14] about suicide. Thinking, not doing. [15]

---

14. *Stedman's Medical Dictionary* 872 (27th ed.2000).

15. I recognize that Dr. Gillespie noted no suicidal ideation. However, the ALJ did not rely on this fact in rejecting Dr. King's report.

*See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir.2002) (stating that "principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ"). Further, it is worth noting that Dr.

Third, the ALJ claimed that neither of Dr. King's diagnoses—anxiety disorder and dysthymic disorder—would suggest the severe depression she reported. But he provided no evidentiary support for this statement, which was another instance of the ALJ "playing doctor."

Fourth, the ALJ stated that Dr. King's report was "commissioned" by plaintiff's lawyer. (Tr. at 331.) Of course, it is counsel's job to marshal and present evidence supporting his or her client's claim. Further, a report cannot be rejected simply because the doctor preparing it was retained by the claimant's lawyer. *See Kent v. Sullivan,* No. 91–C–1474, 1992 WL 80518, at \*11–\*12, 1992 U.S. Dist. LEXIS 5471, at \*33–\*34 (N.D.Ill. Apr. 9, 1992).[16]

Fifth, the ALJ criticized Dr. King for not expressing "concerns with regard to the clear elements of exaggeration on the MMPI." (Tr. at 331.) It is unclear what the ALJ meant by this. Perhaps he confused Dr. Roets's report with Dr. King's on this issue: Dr. Roets stated that plaintiff's scores reflected an attempt to exaggerate on the MMPI she administered, but there is no indication that similar scores were obtained on the MMPI Dr. King administered. If there was no evidence of exaggeration, there was nothing for Dr. King to be concerned about. Even if there was, she—unlike the ALJ—is a mental health professional and thus able to discount for any exaggeration in her conclusions. Perhaps the ALJ was referring to Dr. King's statement that a "prominent concern about physical integrity and the presence of a large number of somatic complaints is suggested." (Tr. at 286.) The ALJ may have interpreted this to mean that Dr. King suspected some of plaintiff's problems were psychosomatic. But even if she did hold such a belief, that does not meant that plaintiff was exaggerating his symptoms. "It implies merely that the source of [plaintiff's] pain is psychological rather than physical. If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits." *Carradine v. Barnhart,* 360 F.3d 751, 754 (7th Cir.2004) Maybe the ALJ was referring to Dr. King's statement that "[s]cale elevations suggest that physical symptoms may be chronic and adhered to with great rigidity." (Tr. at 286.) But again, this does not mean that plaintiff was making it up.

Finally, the ALJ stated that Dr. King was not being objective, instead accepting plaintiff's claims at face value. This is incorrect. Dr. King relied on a battery of tests in reaching her conclusions. Further, doctors are allowed to rely on their patients' descriptions of their conditions. *See Brown v. Barnhart,* 298 F.Supp.2d 773, 792–93 (E.D.Wis.2004). How else is a psychologist to evaluate a patient's mental illness, other than talking to him? Depression does not show on an x-ray. As a professional, Dr. King is presumably trained to scrutinize patient statements. The ALJ's implicit claim that she acted unprofessionally is without basis. *See Carradine,* 360 F.3d at 755.

### b. Dr. Roets

The ALJ also erred by not according weight to Dr. Roets's opinion (or explaining why the report was entitled to no

Roets did report a suicide attempt by plaintiff when he was younger.

16. It is true that a physician who sees a patient based not on the patient's medical need for treatment or evaluation, but solely on his need to obtain a report in support of his claim for disability, is not a "treating source" whose report is entitled to special weight. 20 C.F.R. § 404.1502. Nevertheless, such reports must be properly considered, along with the other medical evidence. *See id.; see also* 20 C.F.R. 416.927(d).

weight). The ALJ discussed the report in the body of his decision but nowhere mentioned it in his conclusions. As the report of an SSA consulting physician, the ALJ was required to evaluate it. *See* 20 C.F.R. § 416.927(d). His failure to do so constitutes an error of law mandating reversal. *See, e.g., Godbey v. Apfel,* 238 F.3d 803, 808 (7th Cir.2000).

Dr. Roets's opinion supported plaintiff's claim of a severe mental impairment. Even though she expressed concern about plaintiff's exaggeration on the MMPI test, Dr. Roets nevertheless made a diagnosis of major depression and post-traumatic stress disorder. She assessed a GAF (Global Assessment of Functioning) of 50, which connotes "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed.2000) (emphasis in original). Thus, the ALJ's failure to evaluate her report cannot be considered harmless.

The ALJ seemed to base his claim of "strong secondary gain considerations" on Dr. Roets's MMPI test results. (Tr. at 331.) However, despite the fact that the MMPI test profile may have been invalid, Dr. Roets nevertheless confirmed a severe mental impairment. The ALJ must address all components of a medical report, not just those which support his conclusion. *See, e.g., Godbey,* 238 F.3d at 808 (reversing where ALJ selectively discussed doctor's report and did not address portions of that report which supported plaintiff's claim that she suffered from cognitive and personality disorders).

### c. Drs. Gillespie & White

Finally, the ALJ's evaluation of the records of Drs. Gillespie and White was limited to the observation that they were "hardly impressive in terms of findings of mental status examination results." (Tr. at 332.) [17] While it is the ALJ's job to weigh and evaluate the evidence, this is not a fair characterization of the records. Dr. Gillespie noted "deficits with respect to attention and concentration." He also stated:

> This patient's emotional functioning is impaired. He exhibits general signs of emotional distress that are moderate to severe in nature.... The patient did exhibit moderately severe symptoms of depression including dysphoria, helplessness, despondency, pessimism and anhedonia. There was also evidence of sleep disturbance, decreased libido and decreased energy levels.

(Tr. at 470.) These observations correspond to several of the "A" criteria of Listing 12.04, Affective Disorders.

Further, Dr. Gillespie confirmed that plaintiff suffered from post-traumatic stress as a result *both* of his experiences in Vietnam and his more recent medical problems. (Tr. at 467.) This is contrary to the ALJ's conclusion that plaintiff's PTSD was not severe because plaintiff returned to work after his service in Vietnam.[18]

Dr. White, a psychiatrist, began treating plaintiff in 1997. He continued plaintiff on Zoloft and Amitriptyline. The final note from Dr. White indicates that although plaintiff was "mentally better," he remained "seriously depressed." (Tr. at 498.) The ALJ mentioned these records in the body of his decision but failed to reconcile them with his conclusion. This was error. *See* 20 C.F.R. § 416.927(d).

---

17. The ALJ incorrectly stated that these records began in 1997. Plaintiff first saw Dr. Gillespie in 1996.

18. It is also worth noting that Dr. Roets confirmed the diagnosis of PTSD.

#### d. (Absence of) Medical Records in 1993–95

Finally, the ALJ stated that the medical records from 1993 to 1995 did not document serious mental health problems. This finding not only ignores certain evidence, it is also in considerable tension with circuit precedent.

██ While limited medical treatment may in some instances support denial of a claim, in this case it does not. In *Wilder*, the Seventh Circuit rejected a similar contention. There, the ALJ noted that the plaintiff's medical records from the relevant time period did not mention depression or other mental illness. 64 F.3d at 336. However, the court noted that these doctors were seeing the plaintiff for physical ailments, and there was no reason to expect them to diagnose depression. *Id.* at 337. Just so here. Further, there is no requirement of contemporaneous medical documentation. "What is required is contemporaneous corroboration of the mental illness." *Wilder*, 153 F.3d at 802.

In the present case, there was contemporaneous evidence (both medical and testimonial) of mental health problems around the relevant time period, which the ALJ ignored. Medical notes from May 1993 record that plaintiff "appears ostensibly to be depressed." (Tr. at 185.) During the September 18, 1995 hearing, plain-

tiff testified that he was taking the antidepressant Sertraline, which had been prescribed by Dr. Long at the VA, for several years. (Tr. at 48–49.) The medical records confirmed that plaintiff was taking anti-depressants during the relevant time period (Tr. at 432; 437; 690; *see also* Tr. at 184; 292), as well as in the years thereafter (*E.g.*, Tr. at 462). Plaintiff also testified during the 1995 hearing that he frequently experienced anxiety and became irritable. (Tr. at 55.) [19]

Moreover, just as in *Wilder*, the only available medical opinions supported plaintiff's claim. 64 F.3d at 337. The opinions were not just from experts "commissioned" by plaintiff's lawyer, but also from the "disinterested expert" retained by the Administration. *Id.* Indeed, the claim here was stronger than in *Wilder* because Dr. King's report was based on an evaluation completed during the relevant time period. In *Wilder*, the psychiatrist had to make a purely retrospective diagnosis. 153 F.3d at 802. Finally, as in *Wilder*, the medical records from Drs. Gillespie and White created shortly after the operative period supported a finding of a severe impairment. *Id.* at 802. Thus, the ALJ's decision cannot be sustained based the limited amount of evidence from the relevant period.

For all of these reasons, the ALJ's decision that plaintiff's mental impairment was non-severe must be reversed. [20]

---

19. This testimony was repeated at the 1999 (Tr. at 353–55) and 2000 hearings (Tr. at 379–80; 382–84).

20. Finally, it is worth noting that the ALJ seemed reluctant to comply with the remand orders of the Council and the court. He spent nearly an entire page of his decision quibbling with the Council's remand order and discussing whether the application was, in fact, moot. (Tr. at 326.) Further, the ALJ displayed a troubling level of impatience and hostility towards plaintiff in both his conduct of the hearing and his decision, applying a

severe tone of skepticism to virtually everything plaintiff said, even when (as with plaintiff's service in Vietnam and difficult childhood) there was no basis in the record for disbelief. (Tr. at 331.) The ALJ claimed that "strong secondary gain considerations exist" and, essentially, that plaintiff's lawyer commissioned Dr. King to concoct a report adding "yet another impairment to the host of complaints which were already being alleged." (Tr. at 331.) Given that plaintiff was at the time of the third hearing receiving benefits based on a finding that he suffered from a listed impairment, and that the undis-

## D. Remedy

■ Ordinarily, when a district judge reverses an ALJ's decision the appropriate remedy is a remand for further proceedings. *Gotz v. Barnhart*, 207 F.Supp.2d 886, 901 (E.D.Wis.2002). This is so because of the respective roles of the ALJ and the court: it is the ALJ's job to weigh the evidence, resolve conflicts, and determine whether the claimant is disabled; the court's task is to determine whether the ALJ's decision was supported by substantial evidence and free of harmful legal error, regardless of whether the court would have reached the same conclusion in the first instance. *See, e.g., Uphill v. Barnhart*, 271 F.Supp.2d 1086, 1094 (E.D.Wis.2003).

■ However, there are two exceptions to the general rule: (1) where the record overwhelmingly supports a finding of disability; and (2) where the delay involved in repeated remands has become unconscionable, or the agency has displayed obduracy in complying with the law as set down by the court. *Gotz*, 207 F.Supp.2d at 901–03. The latter exception applies here.

This application was filed 11 years ago. Plaintiff has been through three administrative hearings already; the matter has been remanded twice by the Council and twice by the court; and the Commissioner has yet to produce an acceptable decision on the claim. This cannot continue.

In *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir.2000), the court noted:

This case, like many others involving disability determinations, has suffered considerable inexplicable delays, and we hesitate to add further abeyance. Mor-

ales has had two hearings before an ALJ followed by two petitions to the appeals council, two appeals to the district court, and the present appeal to the court of appeals. The disability determination has already taken ten years and the record is unlikely to change. Furthermore, the delay in this case has been caused by deficiencies that are not attributable to any error of the claimant. Moreover, the extensive medical record, wrongly rejected by the ALJ, is substantial evidence that Morales suffers from a severe mental disability that renders him unable to engage in substantial gainful activity. [Therefore,] we reverse the judgment of the district court and do not remand this case for further administrative proceedings.

The same result must be reached here. *See also Rohan v. Barnhart*, 306 F.Supp.2d 756, 770–71 (N.D.Ill.2004) (awarding benefits where litigation lasted 11 years, there were three hearings before an ALJ, three petitions to the Appeals Council, three appeals to the district court, two concessions by the Commissioner that ALJ decisions were inadequate, and one appeal to the court of appeals).

Further, as in *Wilder*, the agency has displayed obduracy in complying with the law. Indeed, the facts of the present case are quite similar to those in *Wilder*. In *Wilder*, the ALJ rejected the "retrospective" opinion of a psychiatrist that the plaintiff was disabled due to depression. The Seventh Circuit reversed, finding the ALJ's analysis and findings deficient. 64 F.3d at 337–38. On remand, the ALJ again denied the claim, and the Seventh Circuit again reversed. "But this time, to

puted medical evidence indicated that plaintiff suffered from a mental impairment, the ALJ's insistence that plaintiff was making it all up was inappropriate. Although the ALJ's conduct was not so offensive as to provide an

independent basis for reversal, *see, e.g., Ventura v. Shalala*, 55 F.3d 900 (3d Cir.1995), it contributes to my decision to reverse, *see, e.g., Sarchet v. Chater*, 78 F.3d 305, 307–09 (7th Cir.1996).

bring the charade to an end, [the court ordered] the Social Security Administration to award Wilder the benefits that she applied for." 153 F.3d at 801.

The court noted that the only new evidence bearing on the issue of the plaintiff's condition adduced at the hearing on remand was the testimony of a psychiatrist, who could not determine whether plaintiff was disabled during the relevant time: when the facts were as plaintiff's counsel stated, he said "yes"; when answering the ALJ's hypothetical, he said "no." The court held that this "left the case exactly where it was the last time: with no reasoned basis for the denial of benefits. Given the obduracy evidenced by the action of the administrative agency on remand, [the court] remand[ed] the case to the agency with directions that the application for benefits be granted." *Id.* at 804.

The same result must be reached here. The matter was remanded so the ALJ could re-evaluate Dr. King's report and obtain a psychological consult. On remand, the ALJ rejected Dr. King's report for reasons no more persuasive than those contained in the first decision (*see* Tr. at 17) and essentially ignored the report of Dr. Roets. Under these circumstances, the only proper remedy is a judicial award of benefits.[21]

### IV. CONCLUSION

**THEREFORE,** for the reasons stated, I decline to follow the magistrate judge's recommendation; and

**IT IS ORDERED** that the Commissioner's decision is **REVERSED,** and the case is **REMANDED** with instructions that plaintiff's August 13, 1993 application, as amended to request a closed period of benefits from August 7, 1993 through November 3, 1995, be granted, pursuant to § 405(g), sentence four.

---

21. Although I do not address the issue, I note that plaintiff may well have been entitled to a judicial award under the first exception to the general rule based on the restrictions on the use of his hands. Further, the fact that the VA found plaintiff's disabled as of August 2, 1993, bolsters the finding that a judicial award is proper.